

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,041

**BRIAN SUNIGA, Appellant**

**v.**

**THE STATE OF TEXAS**

ON DIRECT APPEAL FROM CAUSE NO. 2012-434109
IN THE 140TH DISTRICT COURT
LUBBOCK COUNTY

*Per curiam*. KELLER, P.J., concurred in the disposition of point of error number 2 and otherwise joined.

### O P I N I O N

We grant Appellant's motion for rehearing, withdraw our prior opinion entered in this

case, and substitute the following opinion of the Court.

In May of 2014, a jury convicted Appellant of capital murder. TEX. PENAL CODE § 19.03(a)(2). Pursuant to the jury's answers to the special issues set forth in the Texas Code of Criminal Procedure, Article 37.071, sections 2(b) and 2(e), the trial judge sentenced Appellant to death. TEX. CODE CRIM. PROC. art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). After reviewing Appellant's seventeen points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment.

## STATEMENT OF FACTS

Appellant was charged with intentionally causing the death of David Rowser while "in the course of committing or attempting to commit the offense of robbery of Jonathan Rowser" on December 26, 2011.[2] The record reflects that David and his younger brother, Jonathan, both worked at a pizza restaurant in Lubbock. At around 10:00 p.m. on the date of the offense, they were preparing to close the restaurant. David was cleaning the bathrooms, while Jonathan was manning the cash register. The last three customers were sitting at a table. Their server was refilling their drinks at a soda fountain near the cash register. Other servers were cleaning the restaurant or talking with Jonathan as they waited for the customers to leave.

---

[1] Unless otherwise indicated, all references to Articles refer to the Code of Criminal Procedure.

[2] Subsequent references to the victims will be by first name because they share the same last name.

Two men entered the restaurant through the front door and approached Jonathan at the cash register. Jonathan and other witnesses believed that the men were there to place a last-minute take-out order until both men pointed guns at Jonathan and shouted at him, demanding money from the cash register. One man was Hispanic, had tattoos on his arms and neck, and was wearing "whiteout" contact lenses that blocked out all the color of his irises. The other man was also Hispanic and had some facial hair as well as a star-shaped tattoo on his face. He was shorter, heavier-set, and darker-complected than the first man. Both men wore "hoodies" and baggy pants.

When Jonathan did not immediately open the cash register, one of the men grabbed the tip jar that was sitting on the counter near the register and both of them headed toward the door. David then emerged from cleaning the men's bathroom. The man wearing the whiteout contacts yelled, "That's what you get," as he shot David three times. David fell to the floor.

Jonathan ran to David, who was bleeding profusely and coughing up blood. David asked Jonathan to help him. Jonathan applied pressure to two gunshot wounds on David's chest. He yelled at David, trying to keep him awake, but David soon lost consciousness. Jonathan kept David's head and torso elevated, trying to help him breathe until first responders arrived. Paramedics loaded David into an ambulance and took him to University Medical Center. In the ambulance, they suctioned blood from David's lungs and inserted an endotracheal tube to keep his airway open. They placed David on a cardiac monitor,

performed chest compressions, and "started an IV." However, David had no breath, pulse, or heart activity. He was pronounced dead in the hospital's trauma care center.

The Lubbock Police Department published descriptions of the suspects based on witness interviews. On the morning of December 27, a woman who worked at the front desk of a motel where Appellant and his accomplice, Sesilio Lopez Jr., had been staying, heard a news story about the robbery-murder. Based on the suspects' descriptions, she believed that Appellant and Lopez were the culprits. She called the motel manager, who then called the "Crime Line" number and provided police with Appellant's and Lopez's names and a description of their vehicle.

Based on this information and details provided in other calls to the "Crime Line," the Lubbock Police Department released a statewide "attempt to locate" bulletin describing the suspects and their vehicle and identifying Appellant and Lopez by name. About twenty-four hours after the offense, Taylor County sheriff's deputies stopped Appellant and Lopez because their vehicle matched the details provided in the bulletin. Upon confirming their identities and the capital murder warrants from Lubbock County, deputies arrested them and seized the vehicle.

## PRE-TRIAL MATTERS

In point of error one, Appellant asserts that the trial court violated the Sixth and Fourteenth Amendments to the United States Constitution "when it failed to prevent [him] from being represented by counsel laboring under a conflict of interest." He states that, once

he brought a potential conflict of interest to the trial court's attention, the court was obligated to inquire into whether a conflict of interest existed. He argues that the trial court did not "make a meaningful inquiry" into his concerns or take adequate steps to ascertain whether the risk of a conflict of interest merited the appointment of new counsel.

Appellant further complains that, even after the trial judge was informed that Appellant had filed a grievance against the entire Office of the Regional Public Defender for Capital Cases ("Public Defender's Office") and had expressed dissatisfaction with "everyone" representing him, the judge stated that there was "no need to worry about it" and again failed to conduct an adequate inquiry. Appellant also urges that, if the trial court's failure to conduct an adequate inquiry resulted in a record that contains insufficient evidence of a conflict, then this Court should not resolve this issue without first abating the appeal and remanding for the trial court to make a proper inquiry. Additionally, Appellant asserts that the error requires automatic reversal because it is impossible to determine the degree of prejudice arising from representation by counsel who had a conflict of interest.

The record reflects that the trial court held a pre-trial hearing on January 29, 2014, a few days after defense counsel informed the judge that Appellant had contacted the director of the Public Defender's Office to say that he wanted another attorney to represent him. The judged asked Appellant if he wanted to say anything to the court, and Appellant answered:

> Like [defense counsel] said, I'm here trying to seek new representation. I have a couple of issues with one of my defense members. I feel like his best interest is more probably with the State than with mine. We've talked on a couple of occasions, and he's told me things that aren't true. He's also told me that he

feels that I could be guilty; therefore, I don't feel like his interests are -- his best interests are with me, I feel they might be with the State, your Honor.

The trial judge asked Appellant, "What other conflicts do you have other than what you just stated?" Appellant responded:

Well, your Honor, I mean, I just -- I don't feel comfortable going into the courtroom with somebody who might think that I'm guilty, or has been telling me things that aren't true. That's -- I mean, we're talking about life and death here in my situation.

The trial judge denied the request, stating that Appellant wanted to replace defense counsel with an attorney who was not qualified to be on the list of attorneys eligible for capital murder case appointments. Defense counsel and Appellant both clarified that counsel, and not Appellant, had suggested the names of substitute counsel. The judge again denied Appellant's request. At the end of this hearing, the judge and parties confirmed that they were scheduled to begin "general voir dire of the jury pool" on March 13, 2014.

On April 16, during individual voir dire, defense counsel made an *ex parte* record, "out of an abundance of caution because of some of the confidentiality rules," that the Public Defender's Office had received a letter from the Office of Disciplinary Counsel. The letter stated that Appellant had filed a grievance against defense counsel, the substance of which named all the attorneys on Appellant's defense team and the director of the Public Defender's Office, and that the grievance had been summarily dismissed. Counsel stated that if the judge thought the matter should be addressed in front of the State, he was willing to repeat this information. The judge stated, "I don't think there's any need to worry about it." Voir dire then continued.

Once a possible conflict of interest is brought to the trial court's attention by either a pre-trial motion or trial objection, the court has a constitutional obligation to take adequate steps to ascertain whether the risk of the conflict of interest is too remote to warrant remedial action. *Dunn v. State,* 819 S.W.2d 510, 519 (Tex. Crim. App. 1991) (citing *Holloway v. Arkansas,* 435 U.S. 475, 484 (1978)). "[I]n evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'" *Wheat v. United States,* 486 U.S. 153, 159 (1988). "[T]he essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.* A trial court has no duty to search for counsel agreeable to the defendant. *King v. State,* 29 S.W.3d 556, 565-66 (Tex. Crim. App. 2000). Further, a defendant cannot manipulate his constitutional right to counsel in a manner that throws the trial process into disarray. *Id.*

In this case, Appellant has not provided a record cite to a pre-trial motion to withdraw or a trial objection, and we have not located such a motion or objection in our independent review of the record. Rather, it appears that, as the result of an off-the-record communication between defense counsel and the trial court, the trial court held a hearing to ask Appellant about any potential conflict. Assuming without deciding that this off-the-record communication was sufficient to trigger the trial court's obligation to inquire and to preserve this matter for appeal, we hold that the trial court made an adequate inquiry.

Whether the trial court's inquiry into an alleged conflict is adequate depends on the circumstances. It is not always necessary for the trial court to hold a hearing concerning an alleged conflict when the defense does not request one, or when a motion to withdraw does not advance a valid basis for the asserted conflict. *See, e.g., Malcom v. State,* 628 S.W.2d 790, 791-92 (Tex. Crim. App. 1982) (stating that the trial court was not required to hold a hearing on a motion to withdraw where the defendant did not request one); *see also Calloway v. State,* 699 S.W.2d 824, 830-31 (Tex. Crim. App. 1985) (declining to find that the trial court neglected its duty to hold a hearing when the motion to withdraw did not advance a valid basis for the asserted conflict). Although no formal motion to withdraw was filed in this case, given that defense counsel suggested the names of replacement counsel, we will look to case law addressing motions to withdraw as instructive.

Generally, when a motion to withdraw merits further inquiry, the trial court's inquiry is adequate if it provides the movant with an opportunity to explain the perceived conflict and his reasons for requesting new counsel. *See, e.g., King,* 29 S.W.3d at 565-66 (concluding that, when the hearing on the motion to withdraw gave the defendant the opportunity to expand on his reasons for dissatisfaction with counsel, but he failed to do so, the trial court did not abuse its discretion in refusing the motion); *Viges v. State,* 508 S.W.2d 76, 76-77 (Tex. Crim. App. 1974) (concluding that, when the trial court held a conference with the defendant and defense counsel, but the only reasons urged for withdrawal were the

defendant's refusal to cooperate and his desire not to be represented by that attorney, the court did not err in denying the motion).

In this case, the trial court made an adequate inquiry by holding a hearing that provided Appellant with an opportunity to express his reasons for his dissatisfaction with counsel. Appellant asserted only that defense counsel had told Appellant "things that aren't true" and "that he feels I could be guilty." When the trial court asked Appellant if he had any additional conflicts, Appellant rephrased his prior assertions. Notably, defense counsel did not ask to withdraw or state that a conflict of interest might impair his representation of Appellant. *See Cuyler v. Sullivan,* 446 U.S. 335, 347 (1980) ("[T]rial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel.").

Appellant's stated concerns at the hearing – that defense counsel had expressed the view that Appellant might be guilty and had told him unspecified "things that aren't true" – were not valid grounds for removal. *See, e.g., King,* 29 S.W.3d at 566 (holding that the trial court did not abuse its discretion in refusing counsel's motion to withdraw when the defendant and his attorney had "personality conflicts" and the defendant complained about counsel's trial strategy and failure to provide updates about his case). Under the circumstances, the trial court was not required to take any additional steps to ascertain the extent of the alleged conflict.

Further, the trial court did not abuse its discretion in refusing to order defense counsel's removal. The trial court has discretion to determine whether defense counsel

should be allowed to withdraw from a case. *King,* 29 S.W.3d at 566; *see also Solis v. State,* 792 S.W.2d 95, 100 (Tex. Crim. App. 1990). Personality conflicts and disagreements concerning trial strategy are typically not valid grounds for withdrawal. *King,* 29 S.W.3d at 565-66. Neither are a defendant's statements to the effect that he is dissatisfied with, and no longer wants to be represented by, counsel. *Viges,* 508 S.W.2d at 76-77; *Rogers v. State,* 488 S.W.2d 833, 834 (Tex. Crim. App. 1973). Further, a criminal defendant's filing of a civil action against his court-appointed attorney is not a per se conflict of interest that warrants the attorney's disqualification. *Dunn,* 819 S.W.2d at 519.

The trial court may also consider the timing of a motion to withdraw based on an alleged conflict in determining whether to grant it. *See, e.g., King,* 29 S.W.3d at 566 (concluding that the trial court did not abuse its discretion in refusing a motion alleging only personality conflicts and disagreements over strategy, when counsel had worked on the case for several months and had made significant preparations for trial, such that granting the motion could have delayed the trial); *Green v. State,* 840 S.W.2d 394, 408 (Tex. Crim. App. 1992) (holding that the court did not abuse its discretion in denying a motion filed "just over one month" before jury selection, when the case had already been reset once to accommodate defense counsel, and counsel's opinion concerning his inability to contact the defendant was "speculative at best"); *Gonzales v. State,* 532 S.W.2d 343, 345 (Tex. Crim. App. 1976) (concluding that the trial court did not err in refusing the defendant's request for another

attorney when he expressed dissatisfaction with defense counsel immediately before jury selection and did not specify how counsel's representation was inadequate).

In this case, as discussed above, the concerns stated by Appellant during the hearing were not valid grounds for removal. Further, defense counsel did not allege a conflict or express support for Appellant's request for new representation. Also, Appellant raised the alleged conflict approximately six weeks before general jury voir dire was scheduled to begin, although he had been represented by the same attorneys for almost two years. Under the circumstances, the trial court did not abuse its discretion by refusing Appellant's request for new representation.

Appellant also complains that the trial court should have removed defense counsel upon learning that Appellant had filed a grievance with the Office of Disciplinary Counsel. However, defense counsel did not move to withdraw at that time, and the grievance had already been summarily dismissed. Moreover, individual voir dire was well underway. *Cf. Perry v. State,* 464 S.W.2d 660, 664 (Tex. Crim. App. 1971) (finding no error when the trial court declined to appoint new counsel after the defendant filed a civil suit against defense counsel, reasoning that, "if [the defendant's] contention were upheld, a defendant could effectively delay or prevent an appeal (or trial)" by suing defense counsel). We conclude that the trial court did not abuse its discretion by denying Appellant's request for new representation after the initial inquiry or by failing to sua sponte remove counsel during individual voir dire. Point of error one is overruled.

In point of error two, Appellant complains that the trial court violated his right to be "personally present at the trial" under Article 33.03,[3] his right to be present at "any pre-trial proceeding" under Article 28.01, § 1,[4] and his "absolute right to be present at all proceedings against him under the Sixth Amendment to the United States Constitution" when the judge conversed with Peggy White, a seated juror, in his absence. He also contends that the trial court violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because White was biased against criminal defendants.[5] At trial,

---

[3] Article 33.03 provides, in relevant part:

In all prosecutions for felonies, the defendant must be personally present at the trial, . . . provided, however, that . . . , when the defendant voluntarily absents himself . . . after the jury has been selected when trial is before a jury, the trial may proceed to its conclusion. When the record in the appellate court shows that the defendant was present at the commencement, or any portion of the trial, it shall be presumed in the absence of all evidence in the record to the contrary that he was present during the whole trial.

[4] Article 28.01, § 1 provides, in relevant part: "The defendant must be present at the arraignment, and his presence is required during any pre-trial proceeding."

[5] For the first time on appeal, Appellant raises a Sixth Amendment claim – distinct from his claim based on his absence from court proceedings – that the trial court's denial of his challenge for cause based on White's alleged bias violated the Sixth Amendment. We decline to address this Sixth Amendment claim because the legal basis he advances differs from his complaint at trial. *See* TEX. R. APP. P. 33.1. (Unless otherwise specified, all references to rules refer to the Texas Rules of Appellate Procedure.) Appellant's trial counsel listed the specific legal grounds for his bias challenge, including the Fifth, Eighth, and Fourteenth Amendments, yet omitted the Sixth Amendment. Under these circumstances, the trial judge could not be expected to understand that Appellant meant to implicitly advance a legal basis he did not enumerate. *See* Rule 33.1(a); *see also Lovill v. State*, 319 S.W.3d 687, 691-92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."); *Reyna v. State*, 168 S.W.3d 173, 179-80 (Tex. Crim. App. 2005) (holding that the Appellant forfeited appellate review of his Sixth Amendment Confrontation Clause argument due to his failure to present that legal basis to the trial court).

Appellant challenged White for cause because (1) the trial court conducted an *ex parte* inquiry with her in violation of Article 33.03, and (2) her comments during the inquiry demonstrated that she was "bias[ed] against criminal defendants," so that her service on the jury would violate the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Appellant contends on appeal that the trial court erred when it denied his challenge for cause on these bases. This point of error raises more than one ground for relief, and therefore it is multifarious. *See* Rule 38.1; *Jenkins v. State,* 493 S.W.3d 583, 605 n.50 (Tex. Crim. App. 2016). Further, Appellant did not object to the trial court questioning the juror in his absence on two of the legal grounds raised on appeal – Article 28.01 and the Sixth Amendment. *See* Rule 33.1(a). However, we will address these claims in the interest of justice.[6]

Based on an ambiguous and misleading record surrounding the trial judge's questioning of White, this Court assumed in its opinion on original submission that one of Appellant's defense attorneys was present during the questioning of White on May 1, 2014.

---

[6] Appellant argues in his motion for rehearing that "this Court, in *Adanandus v. State*, 866 S.W.2d 210, 216-217 (Tex. Crim. App. 1993)[,] . . . treated Art. 28.01's requirement of the defendant's presence as being of a type that cannot be waived." He also argues that the Sixth Amendment right to be present at one's trial "must fall into the second category of rights under *Marin* [*v. State*, 851 S.W.2d 275, 278-79 (Tex. Crim. App. 1993)], i.e.[,] those rights that must be implemented unless expressly waived, since otherwise it would be incumbent on a defendant to request to be present at his own trial in order to avoid forfeiture of that right[.]" We need not decide today where the present claims and circumstances fall within our *Marin* framework. *See, e.g., Routier v. State*, 112 S.W.3d 554, 587 (Tex. Crim. App. 2003) ("Even if we assume that the appellant did not need to object to preserve these complaints[,] the appellant still cannot prevail.").

We stated that it was unclear whether Appellant was personally absent from the proceeding, noting the presumption of presence found in Article 33.03. *See* Art. 33.03 ("When the record in the appellate court shows that the defendant was present at the commencement, or any portion of the trial, it shall be presumed in the absence of all evidence in the record to the contrary that he was present during the whole trial."). We also assumed, based on the record before us, that the trial judge questioned White in the courtroom. The submission of a corrected record has shown those assumptions to be incorrect.

On March 14, 2017, Appellant filed a motion for rehearing alleging four grounds. In one of Appellant's grounds, he asserted: "The Court was misled by an ambiguity in the record that belies the actual circumstances of the trial court's ex parte questioning of a seated juror who had inquired into Mr. Suniga's custody status and declared herself 'scare[d] to death' of incarcerated defendants."

Shortly thereafter, on March 27, 2017, this Court received a supplemental reporter's record (corrected Volume 24), which encompassed the voir dire proceedings held on May 1, 2014. In this supplemental volume, the court reporter inserted the following parenthetical statement immediately prior to the trial judge's questioning of Juror White concerning a reported encounter with Appellant in the courthouse basement: "(The following proceedings were had in the jury room with only the Judge, Court Reporter, and Juror White present.)." The court reporter also added the following parenthetical statement immediately after the judge concluded his questioning of White and the juror departed: "(The following

proceedings were had in open court with Defendant and attorneys present.).'" Despite the reference to the "jury room," the court reporter certified that all proceedings were held in "open court" or in the judge's chambers.

Faced with questions concerning the accuracy of the trial record in this matter, this Court issued an order abating Appellant's appeal and remanding this case to the trial court. *See Suniga v. State*, No. AP-77,041 (Tex. Crim. App. June 14, 2017) (not designated for publication); *see also* Rule 34.6(e)(2), (3). This Court ordered the trial court to conduct a hearing to determine:

> [T]he specific circumstances under which Juror Peggy White was questioned by the trial judge; the location where White was questioned; who was present during the questioning; and, if defense counsel and the defendant were not present, when defense counsel and/or the defendant received actual notice of the questioning and when they were provided with a transcript of the questioning.

In a footnote, we noted that the March 2017 supplemental record's "parenthetical statement that the juror was questioned in the jury room appear[ed] to conflict with the statements in the court reporter's certification." We ordered that the trial court's hearing be transcribed and ordered the trial court to:

> determine whether the court reporter's supplemental record filed in this Court on March 27, 2017, accurately reflects the events that occurred in connection with the trial court's questioning of White. If the trial court finds any inaccuracies in the reporter's record, the court shall order the court reporter to "conform the reporter's record . . . to what occurred in the trial court, and to file certified corrections" in this Court. *See* TEX. R. APP. P. 34.6(e)(2). The trial court shall order the appropriate supplemental clerk's and reporter's records – including all findings and orders and any certified corrections – to

be prepared and forwarded to this Court no later than 30 days after the date of this order.

After requesting and receiving extensions of time, the trial court held a hearing on December 20, 2017. At the hearing, the trial court apparently allowed the parties to address the remanded issues set out above along with related issues Appellant raised in his initial Article 11.071 application for a writ of habeas corpus. As a result, the transcript of the hearing on remand includes witness testimony and other evidence beyond the limited subject matter of this Court's order remanding this case. Yet this Court's remand to correct the record pursuant to Rule 34 cannot authorize supplementing the direct appeal record with substantive evidence that was not admitted at trial or exceeds the limited issues set out in the remand order. *See Ramirez v. State*, 104 S.W.3d 549, 551, n.9 (Tex. Crim. App. 2003) (citing *Farris v. State*, 712 S.W.2d 512, 515-16 (Tex. Crim. App. 1986), for the proposition that an "appellate record cannot be supplemented with evidence not developed during the proceedings surrounding the defendant's trial"); *see also Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (holding that a record supplementation rule "cannot be used to create a new appellate record"). Accordingly, we will not consider the testimony and evidence from the hearing – or new arguments based on that testimony and evidence – that exceed the scope of our remand order.[7]

_____

[7] A trial court's jurisdiction on remand is limited to the subject matter of the remand. *See* Rule 25.2(g) ("Once the record has been filed in the appellate court, all further proceedings in the trial court - except as provided otherwise by law or by these rules - will be suspended until the trial court receives the appellate-court mandate."); *Lewis v. State*, 711 S.W.2d 41, 43 (Tex.

(continued...)

After the hearing, the court reporter issued a new corrected version of Volume 24 and it was filed in this Court on March 2, 2018. The March 2018 supplement contains essentially the same content as the March 2017 supplement. However, the court reporter amended his certification to state that all transcribed proceedings "occurred in open court or in chambers, unless otherwise specified in the record[.]"

The trial court subsequently entered findings of fact stating in relevant part that the new supplemental volume:

> accurately reflects the location of the trial court's questioning of Mrs. White and accurately identifies who was present at that questioning as well as the content of the questioning itself. The record created of the evidentiary hearing held on December 20, 201[7], has clarified that defense counsel and the defendant had no prior notice that the trial court intended to question Mrs. White outside their presence on May 1, 2014, and that they did not receive a transcript of that questioning until later that day (at 11:47:23 a.m.).

The corrected record reflects that White was seated on the jury on April 15, 2014. During her voir dire, White indicated that she understood the presumption of innocence and would afford this presumption to Appellant. She stated that she had four sons and that "if anything happened I would want people to give them the benefit of the doubt before judging them." White also indicated that she worked in the courthouse as a clerk for "Justice of the

---

[7](...continued)
Crim. App. 1986) (explaining that, when an appellate court abates an appeal, the trial court's jurisdiction is limited and the court "is not authorized to conduct an evidentiary hearing to develop a record of *new testimony* and *other evidence* that was not presented at trial, or developed on motion for new trial") (emphasis in original). However, our refusal to consider evidence outside the direct appeal record here will not prevent this Court from considering such evidence later in the context of an Article 11.071 application for writ of habeas corpus, if it is properly presented.

Peace Precinct Four." She also revealed that, ten or fifteen years earlier, she had ministered inside a prison with her church group. She described the experience of entering the prison as "real sad when you got past the second gate," and stated that the group "had to be very careful and cautious" while they were there.

When the prosecutor asked White if she recalled seeing a sign that said, "Hostages will not be allowed," as she passed the second gate, defense counsel objected. After White stepped out of the courtroom, defense counsel asserted that the prosecutor's reference to a sign about hostage-taking played on White's fears and was an attempt "to heighten some idea that prison . . . is a dangerous place." The trial court sustained the objection "as far as talking about hostage taking," but added that the prosecutor could question White about "her thoughts" concerning her experience inside the prison.

When White returned, and before anyone asked her a question, White related that she had also been inside a county jail with a ministry led by a friend of hers who was a former convict. The prosecutor then returned to the topic of White's experience of ministering inside the prison and asked her if "[a]nything about that situation would have an influence on the way [she would] decide these issues in this case." White answered, "No."

At the end of questioning, White stepped out of the courtroom. Defense counsel challenged her for cause, alleging that the prosecutor had made an improper reference to the prison sign about hostage-taking. Counsel argued that this reference created "the possibility that [the] juror has some bias in her mind about the [applicable] law . . . . related to her own

personal experience in the TDC[J][8] unit." The trial court denied the challenge for cause. Defense counsel declined to use a peremptory strike against White. The judge then called White into the courtroom and informed her that she had been selected as a juror. He advised her that the trial would probably start in a few weeks and reminded her not to read or listen to anything about the case.

On April 28, White was sworn in as a juror when the trial court called the first nine jurors to swear them in and discuss whether they had viewed recent media coverage of the case. Around that time, the trial court received information about White that it deemed to warrant further inquiry.[9] On April 30, 2014, the judge told the parties, "With regard to Ms. White, I'll check on something and let y'all know." Then, on the morning of May 1, 2014, the judge spoke with White in the jury room. Only White, the trial judge, and the court reporter were present. The following exchange transpired:

> THE COURT: The reason I wanted to talk to you is they indicated to me that you had seen the Defendant in the basement.
>
> JUROR WHITE: No, I have not seen the Defendant in the basement.
>
> THE COURT: Anywhere?
>
> JUROR WHITE: Anywhere.

---

[8] We surmise that "TDC" refers to the Texas Department of Criminal Justice ("TDCJ"), which was formerly named the Texas Department of Corrections ("TDC").

[9] The record does not reflect the exact source, timing, or content of the communications that led to the further inquiry.

JUROR WHITE: I have not ever seen the Defendant. I've never seen anyone in real clothes in the basement. Only in the -- like the jumpsuit --

THE COURT: Uniform?

JUROR WHITE: -- stuff and the shackles. I've never seen anyone in real clothes.

THE COURT: Okay.

JUROR WHITE: Did they -- have they seen me?

THE COURT: I don't know. The deputies -- I thought they had said that you had said you had seen him.

JUROR WHITE: I have not.

THE COURT: Okay.

JUROR WHITE: Now, I asked them if he had ever been there. I asked Sharon if he had ever been there. And she said, "Yes, he's -- he comes every day."

And I said, "Oh, my goodness. I didn't know that." But I haven't been to the basement but a couple of times in the last few weeks.

THE COURT: Okay.

JUROR WHITE: And I have never seen anyone in regular clothes. But, now, when I'm in the -- my room, we close the door when anyone is going by. And if anyone -- if I should be caught in the hallway, I usually move back against the wall and put my head down, because I don't want to make eye contact with any of those people, because I don't want them to -- you know, it's kind of scary -- it's scary enough to have to work down there knowing they're there. But, no, I've never seen him.

THE COURT: Okay. That's all I need to know then.

JUROR WHITE: Okay.

THE COURT: Everything else okay?

JUROR WHITE: Yeah.

THE COURT: I suspect we're going to have a jury within the next few days, I'm hoping. So --

JUROR WHITE: All right. No. No, I've not had any --

THE COURT: Okay.

JUROR WHITE: No. That would scare me to death. I'm sorry.

THE COURT: Well, we don't want to do that.

(JUROR WHITE OUT)

(The following proceedings were had in open court with Defendant and attorneys present.)

THE COURT: Are y'all ready?

[DEFENSE COUNSEL]: No, sir.

(BRIEF RECESS)

Immediately following this inquiry and recess, the parties resumed individual voir dire of prospective jurors. The remaining jurors were seated that afternoon. The trial court denied Appellant's challenge for cause to the twelfth juror. Appellant, having exhausted his peremptory strikes, requested an additional strike. The trial court denied this request and seated the twelfth juror, whom Appellant identified as objectionable.

One of Appellant's defense attorneys then requested a transcript of that inquiry of Juror White:

[DEFENSE COUNSEL 2]: Your Honor, I have one issue I'd like to put on the record if I could with regard to Juror White. It's my understanding that things were put on the record about this juror at some point concerning potential issues she may have had for service -- service on the jury. And at this point, your Honor, even if it's just a

rough draft copy that Defense would request a copy of those matters that were put on the record with regard to juror Peggy White.

THE COURT: I have no objection to that being furnished to you.

[DEFENSE COUNSEL 2]: And given that, your Honor, I all [of] the sudden cannot identify what juror number she was.

THE COURT: I think she's 58.

[PROSECUTOR]: Yes, sir.

[DEFENSE COUNSEL 2]: Given that she was by my records, your Honor, she was the sixth seated juror.

THE COURT: That's correct.

[DEFENSE COUNSEL 2]: I would ask the Court to allow me to come back and revisit this issue of peremptory strikes after I'm able to review the rough draft of the transcript.

THE COURT: Okay.

[DEFENSE COUNSEL 2]: I don't have any objection to proceeding, but I would like the right to come back and address that.

THE COURT: That's fine.

[DEFENSE COUNSEL 2]: Thank you, your Honor.

On May 2, 2014, having reviewed the transcript of the court's conversation with White, defense counsel challenged White for cause:

[DEFENSE COUNSEL 2]: Your Honor, with regard to the seated juror -- I believe it was the sixth seated juror, Ms. White. This morning, after review of the transcript that's part of the record in this case . . . in light of that transcript, your Honor, we're going to challenge that juror, Ms. White, for cause. She's a seated juror at this point. We're going to challenge her for cause in that we believe the Court's inquiry with her

ex parte is a violation of 33.03 of the Code of Criminal Procedure requiring the Defendant to be present at trial.

Additionally, your Honor, in the transcript, she indicates -- there is a discussion -- the record will speak for itself, but there is a discussion about her passing, or being in the hallway -- apparently, in the basement of this building with inmates from the jail. And toward the end of that -- of that discussion with the Court, she . . . -- the only context is in the paragraphs above, but she says, "All right. No. No. I've not had any." The Court replied, "Okay." She said, "No. And that would scare me to death." The implication of the juror's statements to the Court are [sic] that being around a defendant scares her to death, and -- or being -- or passing folks in the basement hallway would scare her to death. A juror who expresses that view, your Honor, cannot afford a defendant the presumption of innocence if she's scared to death of them.

Further, she would not be able to assess the credibility of the Defendant that she's scared to death of who might take the stand and testify. And we believe that that establishes bias against criminal defendants in this juror's mind. And based upon that record -- I believe in the last sentence she has to be making reference to my client, your Honor. And so she has a specific bias against [Appellant] that's impermissible under Texas law. A bias cannot be collateral. It would also violate [Appellant's] rights under the 5th Amendment, the 8th Amendment and 14th Amendment, your Honor. Particularly due process under the 5th Amendment.

And so we would ask to challenge the juror at this point on those two bases. That would be -- that would be the first thing, your Honor, is to challenge the juror on that basis.

THE COURT: The Court was of the opinion that she was making reference to the fact that the deputies tell the employees on any floor where any defendants are being taken to stand aside, and not be in the hallway where they may have more than one defendant who is being transferred from one place to another.

[DEFENSE COUNSEL 2]: That's the -- that's the only challenge for cause I have against the juror, are those two bases, your Honor.

THE COURT: The Court will deny your challenge.

[DEFENSE COUNSEL 2]: And for purposes of the record, Judge, I would also ask -- the Defense at this point is out of peremptory strikes. I would ask for a peremptory strike, specifically, to exercise against seated Juror White, Juror No. 52 --

THE COURT: 58.

[DEFENSE COUNSEL 2]: 58? We would request an additional peremptory to exercise against that juror.

THE COURT: Any response, [prosecutor]?

[PROSECUTOR]: Judge, I probably need to consult with the lead counsel on this before I put anything on the record with regards to this. If you could give me five minutes, I may have a response.

After consulting with the lead prosecuting attorney, the prosecutor responded:

[PROSECUTOR]: And, your Honor, the State would oppose and would object to the Court giving the Defense an additional peremptory for Ms. White. This is a big -- in our opinion, a big to[-]do about nothing. In that this allegation that the Court went and talked to Ms. White about was based on false information from the beginning, and I'm not sure that that's ever been put on the record. But based on --

THE COURT: I would say that's probably true.

[PROSECUTOR]: And that's what the Court had told [defense counsel] and I a couple of days ago, that it was based on false information. She never in that transcript told the Court that she is scared of this Defendant.

[Defense counsel] is insinuating that from her comments, but that's not what she said. In addition, the Defense had peremptories available both at the time that Ms. White was taken on voir dire, as well as when this information came to light they still had peremptories available, and they chose to use them on other jurors. . . . And so we would object to the Court allowing an additional peremptory strike for her.

THE COURT: The Court is going to deny your motion at this time to -- for a peremptory to strike Ms. White. The Court will deny your challenge to cause as to Ms. White.

[DEFENSE COUNSEL 2]: Yes, your Honor. For purposes of the record, the Defense would identify Juror White as an objectionable juror, in addition to Juror 105, Mr. Hanfeld.

"One of the most basic of the rights" guaranteed by the Sixth Amendment's Confrontation Clause "is the accused's right to be present in the courtroom at every stage" of trial. *Illinois v. Allen*, 397 U.S. 337, 338 (citing *Lewis v. United States*, 146 U.S. 370 (1892)). This Court has recognized that, under the Sixth Amendment and Article I, § 10 of the Bill of Rights in the Texas Constitution, "the scope of the right of confrontation is the absolute requirement that a criminal defendant who is threatened with loss of liberty be physically present at all phases of proceedings against him[.]" *Jasper v. State*, 61 S.W.3d 413, 423 (Tex. Crim. App. 2001) (quoting *Miller v. State*, 692 S.W.2d 88, 90 (Tex. Crim. App. 1985)). Under Article 33.03, an accused's right to be present at his trial is unwaivable until such a time as the jury "has been selected." *Miller,* 692 S.W.2d at 91, 93. Thus, we have held that a defendant must be present and may not voluntarily absent himself until after voir dire. *Adanandus,* 866 S.W.2d at 217-20. "Article 28.01 does not speak to hearings alone but mandates the appearance of a defendant at 'any pretrial proceedings.'" *Id*. at 218 (quoting *Riggall v. State*, 590 S.W.2d 460, 461 (Tex. Crim. App. 1979)). In *Adanandus*, this Court ruled that a meeting transcribed by a court reporter in which the trial court overruled a defense motion constituted a "pre-trial proceeding" under Article 28.01. *Id*. at 219.

The corrected record in Appellant's case reveals that neither Appellant nor his attorneys were present when the trial court questioned Peggy White, a seated juror, in the jury room on May 1, 2014. The court reporter transcribed the judge's brief exchange with the juror that day concerning a suspected encounter between White and Appellant. Nothing in the record before us indicates that Appellant and his counsel's absence from this proceeding was knowing or voluntary. Based on the corrected record, we conclude that the trial court's conversation with White in their absence violated Appellant's right to be personally present at his trial.

Having found error, and presuming it is of constitutional dimension, we determine whether Appellant was harmed under the standard applicable to constitutional error. *See, e.g., Jasper,* 61 S.W.3d at 423 (when faced with non-constitutional and constitutional error, we will apply the standard of harm for constitutional error); *see also* Rule 44.2(a) ("If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.").

When a defendant's constitutional right to be present during the trial has been violated, we consider whether the defendant's presence bears a reasonably substantial relationship to his opportunity to defend himself. *See Adanandus,* 866 S.W.2d at 219 (citing *Snyder v. Massachusetts,* 291 U.S. 97, 105-08 (1934)); *see also Routier*, 112 S.W.3d at 577;

*Cooper v. State,* 631 S.W.2d 508, 512 (Tex. Crim. App. 1982). If it does not, then any error is harmless. *Adanandus,* 866 S.W.2d at 219.

The defendant's right to be present ensures that he is able to "give advice or suggestion" to defense counsel and to exercise control over the conduct of the trial. *See, e.g., Snyder,* 291 U.S. at 106. A defendant's presence during jury voir dire can bear a reasonably substantial relationship to his opportunity to defend himself in several ways. *See Sumrell v. State,* 326 S.W.3d 621, 625 (Tex. App.—Dallas 2009, pet. dism'd). Voir dire provides prospective jurors with an opportunity to view a defendant and discover whether they know him. *Id.* It also provides a defendant with an opportunity to view the prospective jurors and determine whether he knows any of them and whether they are biased for or against him. *Id.* Also, a defendant may assist defense counsel in the jury-selection process, such as by watching prospective jurors' reactions to counsel's questions. *Id.*

In this case, Appellant was present during White's voir dire. Therefore, by the time of the later inquiry, he and White had already had the opportunity to view each other and determine whether they were acquainted. Appellant's attorney received notice of the judge's ex parte exchange with White – and a transcript of the questioning – before noon on the same day it occurred. After receiving notice and the transcript of the exchange, Appellant did not seek to question White, even though White worked in the building and trial on the merits had not commenced. *Cf. Adanandus,* 866 S.W.2d at 217 (holding that, after eight venire members were examined in voir dire proceedings by the prosecutor and defense counsel in

the defendant's absence, his absence was "essentially 'undone'" and Article 33.03 was satisfied when the trial court and parties repeated those examinations in the defendant's presence).

Further, Appellant does not assert, and the record does not demonstrate, that he had any information about White, not available to his attorneys or the court, that would have affected the court's inquiry. *Cf. Jasper,* 61 S.W.3d at 424 (concluding that no harm resulted from the defendant's absence while the trial court heard jury excuses because, even if he had been present and objected to the excuses, the trial court would have been well within its discretion in overruling the objections). The record shows that the reason for the trial court's inquiry – White's purported encounter with Appellant in the courthouse basement – turned out to be a false report. White stated that she had never seen Appellant in the basement.

Nevertheless, Appellant contends in his supplemental briefing that his presence at the proceedings bore a "relation, reasonably substantial" to his opportunity to defend himself. *See Adanandus*, 866 S.W.2d at 219 (citing *Snyder*, 291 U.S. at 105-08). Specifically, he argues that, had he been present for the court's questioning of White, "White's reaction to [his] mere presence at the interview – the encounter that she admitted would 'scare her to death,' . . . – would have demonstrated to the trial court her inability to function as an impartial juror who could apply the presumption of innocence." Appellant's contention is purely speculative and he has not pointed us to any evidence showing that White reacted in a fearful manner to his presence during other court proceedings. *Cf. id.* at 220 ("There is no

evidence that the trial court might have ruled differently during the meeting had appellant been present and a supposition of that nature is unreasonable."). Therefore, based on the corrected record before us, we are persuaded beyond a reasonable doubt that Appellant's absence from the trial court's conversation with White did not affect his opportunity to defend himself and did not contribute to his conviction or punishment.

Next, we consider Appellant's assertion that the trial court erroneously denied his challenge for cause on the ground that White was biased, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. To demonstrate White's bias, Appellant points to her answers during the trial court's May 1st inquiry. Specifically, Appellant complains that White stated that working near the holding cell, and particularly encountering detainees in the basement hallway, was "scary." She indicated that "That" – *perhaps* referring to the possibility of encountering Appellant in the basement hallway – would "scare [her] to death." Defense counsel challenged White on the grounds that her responses indicated that she was biased against Appellant and against criminal defendants generally, such that she would not be able to presume Appellant innocent or find Appellant credible if he testified.[10]

---

[10] Appellant adds on appeal that White's responses demonstrated that she had prejudged Appellant's future dangerousness. We will not consider this last allegation because Appellant did not raise it before the trial court. *See* Rule 33.1; *see also Layton v. State,* 280 S.W.3d 235, 239 (Tex. Crim. App. 2009) ("A specific objection is necessary to inform the trial judge of the issue and basis of the objection[.]").

Where a party wishes to challenge a potential juror for bias, that party must demonstrate, through questioning, that the potential juror lacks impartiality. *Buntion v. State*, 482 S.W.3d 58, 84 (Tex. Crim. App. 2016) (citing *Wainwright v. Witt,* 469 U.S. 412, 423 (1985)). The proponent of the challenge for cause must show that the prospective juror understood the requirements of the law and could not overcome her prejudice well enough to follow the law. *Davis v. State,* 329 S.W.3d 798, 807 (Tex. Crim. App. 2010). Before a prospective juror may be excused for cause on the basis of bias or prejudice, the law must be explained to her and she must be asked whether she can follow that law regardless of her personal views. *Feldman v. State,* 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

On appeal, in determining whether a trial court abused its discretion when it overruled a challenge for cause during voir dire, we examine the voir dire of the venire member as a whole and decide whether the record shows that her convictions would interfere with her ability to serve as a juror and uphold her oath. *Buntion,* 482 S.W.3d at 84. We review a trial court's ruling on a challenge for cause with considerable deference because the trial court is in the best position to evaluate the venire member's demeanor and responses. *Newbury v. State,* 135 S.W.3d 22, 32 (Tex. Crim. App. 2004). We will reverse a trial court's ruling on a challenge for cause "only if a clear abuse of discretion is evident." *Colburn v. State,* 966 S.W.2d 511, 517 (Tex. Crim. App. 1998).

In this case, White did not directly express bias against Appellant. Rather, her statements during voir dire indicated that she understood the presumption of innocence and

would afford this presumption to Appellant. Her statements during the later inquiry expressed a generalized fear of encountering pre-trial detainees, perhaps including Appellant, in the courthouse basement.

As the party challenging White for cause, Appellant had the burden of proving by a preponderance of the evidence that White lacked impartiality. However, Appellant never requested – after learning of the trial court's conversation with White or during the subsequent hearing when defense counsel challenged her for cause – an opportunity to question White about whether she could overcome her prejudice well enough to follow the law. Without more, White's generalized fear of encountering detainees in the basement did not disqualify her. *See Ladd v. State,* 3 S.W.3d 547, 560 (Tex. Crim. App. 1999) (finding no abuse of discretion or violation of due process when the trial court denied a challenge for cause against a venire member who stated that he "leaned" in the direction of believing that the defendant was guilty because the defendant had been arrested and indicted, but who also stated that he could follow the law, hold the State to its burden of proof, and presume the defendant innocent); *Jones v. State,* 982 S.W.2d 386, 389 (Tex. Crim. App. 1998) (stating that jurors must not have extreme or absolute positions regarding the credibility of any witness, but "complete impartiality cannot be realized as long as human beings are called upon to be jurors"); *see also Bell v. State,* 724 S.W.2d 780, 797 (Tex. Crim. App. 1986) (quoting *Irwin v. Dowd,* 366 U.S. 717, 722 (1961)) ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient

to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.").

In his supplemental briefing, Appellant further contends that the law enforcement warnings that caused White to avoid interaction with the inmates and put her "head down" reinforced her fear of inmates. He again urges that White's fear indicated that she had "a bias or prejudice" against him and against "the law applicable to the case upon which the defense [was] entitled to rely." *See* Art. 35.16(a)(9), (c)(2). He compares his case to two Supreme Court cases in which federal agents spoke with jurors. *See Gold v. United States*, 352 U.S. 985 (1957); *Remmer v. United States*, 347 U.S. 227 (1956).

*Gold* and *Remmer* are distinguishable. In *Gold*, a 1950s case involving a charge of falsification of a noncommunist affidavit, an FBI agent contacted three jurors or their families during the trial and asked if they had received communist propaganda – a question of particular concern during the McCarthy Era. 352 U.S. 985. In *Remmer*, a third party approached a juror in an attempt to influence him, the juror reported the contact to the judge, the judge called the FBI, and the FBI interrogated the juror during the trial. *Remmer*, 347 U.S. at 228; *see also Remmer v. United States*, 350 U.S. 377, 380-81 (1956) (after remand). In the instant case, the direct appeal record before us does not show exactly what led White to put her "head down." Thus, the record does not support Appellant's argument that law enforcement heightened White's fear of him to the point where she exhibited "a bias or prejudice" against him or "the law applicable to the case."

Additionally, Appellant argues that this Court should find that White's statement that she was "scare[d] to death" implicated the federal doctrine of "implied juror bias." Appellant refers us to *Uranga v. Davis*, 879 F.3d 646, 562-63 (5th Cir. 2018) (holding that, in "extreme situations" where the facts inherently create a "substantial emotional involvement," the court is justified in finding a violation of the Sixth Amendment due to "implied juror bias"). Appellant also relies upon *Brooks v. Dretke*, where the Fifth Circuit applied the implied juror bias doctrine when a juror was arrested for carrying a loaded pistol into the courthouse on the day of the defendant's sentencing hearing. 444 F.3d 328, 332 (5th Cir. 2006).

Appellant has not shown that his case presents circumstances sufficient to trigger application of the implied juror bias doctrine. In *Brooks*, the gun-carrying juror's "fate rest[ed] in the hands of the same prosecutor now seeking the death penalty in Brooks's trial." *Id*. Throughout the sentencing hearing, the juror did not know whether he would be prosecuted and suffered "unrelenting embarrassment." *Id*. The Fifth Circuit held that the prosecutor's power over the juror created an "intolerable risk." 444 F.3d at 332. Further, the Fifth Circuit recently reversed the *Uranga* case on rehearing. *Uranga v. Davis*, 893 F.3d 282 (5th Cir. June 18, 2018). The Fifth Circuit on rehearing held that the fact that the defendant damaged a juror's lawn while fleeing from police "d[id] not rise to the level of the extreme situations wherein courts have previously imputed juror bias." *Id*. at 289. In light of the above authority, this Court will not impute bias to Juror White, who merely expressed a vague fear of detainees and possibly of Appellant.

Appellant further maintains in his reply brief that, even if implied juror bias does not apply here, White was "actually impaired in her ability to follow the law and abide by her oath." The record does not support his contention. Juror White expressed during voir dire a commitment to the presumption of innocence. For example, she indicated that, if one of her four sons were charged with an offense, she "would want people to give them the benefit of the doubt before judging them." Appellant has not demonstrated on the record before us that she was actually impaired in her ability to follow the law or her oath as a juror.[11]

The trial court did not abuse its discretion in concluding that White's responses during the inquiry did not demonstrate that she could not afford Appellant the presumption of innocence or impartially judge his credibility if he chose to testify. Point of error two is overruled.

In his third point of error, Appellant asserts that the trial court's erroneous denial of his motion to change the venue of his trial in light of prejudicial pre-trial publicity violated the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He complains that extensive pre-trial media coverage projected a "particular view of the evidence" that prejudiced the community against him. Therefore, he contends, it was highly improbable that an impartial jury could be selected.

---

[11] Appellant avers that, by the time defense counsel requested a transcript of the court's exchange with White, the court had "permitted defense counsel to unwittingly expend the additional peremptory strikes they might otherwise have exercised on White." The fact that Appellant's counsel exhausted his peremptory strikes before requesting the transcript does not have any bearing on the merit of Appellant's challenge for cause to White.

The record shows that individual jury voir dire commenced on March 31, 2014. By the time court recessed for the day on April 23rd, nine jurors had been selected. At a hearing on the morning of April 24th, defense counsel stated that he intended to file a motion to transfer venue. Counsel explained that he had seen a news article the previous evening on the web site for KCBD, the NBC affiliate in Lubbock. Counsel also stated that he had recorded KCBD's 10:00 p.m. television news, which featured a similar story. The trial judge stated that he had not seen the article but he had seen the television news story, and he noted that it featured photographs of Appellant and his co-defendant. Defense counsel expressed concern that the online article purported to be about gangs, but that most of it was actually about Appellant and the instant case. He noted that the article included the content of witness statements in the case and details about the aftermath of the shooting. Counsel asserted that some of this information could only have come from law enforcement officers associated with the case.

Defense counsel asked the court to enter a "gag order" specifically instructing the parties, the Lubbock Police Department, and the Lubbock County Sheriff's Office not to discuss the case. The trial court agreed to enter a "gag order." The judge added that "Rhonda," who we surmise was the court coordinator, would contact the people who had already been selected for the jury and tell them not to "read anything regarding that story." He noted that, although he had instructed each selected juror not to read or watch any news accounts about the instant case, the story at issue was not about this particular offense but

rather was a report about a gang that included a discussion of this offense. The judge requested that the prosecutor instruct the Sheriff, the Chief of Police, and the Lubbock-area Department of Public Safety ("DPS") Director that their employees were not to communicate with the media about the instant case, and the prosecutor advised that he would send them an e-mail that day.

That afternoon, the trial court entered a "News Media Communication Gag Order." In relevant part, the order recited that, due to information the Court had received about the April 23rd news stories, the Court ordered persons involved in the investigation and prosecution of this case to refrain from further communication with all news media regarding this case or the defendants. The order applied to "all members of the Lubbock Police Department, Lubbock County Sheriff's Department, Department of Public Safety for the State of Texas, the Lubbock County District Attorney's office, and the attorneys/investigators for the defendant." The prosecutor informed the court and defense that the Lubbock Chief of Police had acknowledged receipt of his e-mail and had indicated that he would instruct all of his officers concerning the gag order, but the prosecutor had not yet received a response from the Sheriff or the DPS Director.

Appellant filed his first motion for change of venue on April 25, 2014, citing Article 31.03;[12] his due process right to be tried by a fair and impartial jury under the Fifth, Sixth,

---

[12] Article 31.03 provides, in relevant part, that a change of venue may be granted on the written motion of the defendant for either of the following causes:

(continued...)

Seventh, and Fourteenth Amendments; his right to effective assistance of counsel under the Sixth Amendment; and the prohibition against cruel and unusual punishment under the Eighth and Fourteenth Amendments. He reiterated in this motion that a news article had appeared on KCBD's web site on the evening of April 23, 2014, titled, "New DPS report highlights gang activity in Lubbock." He explained that the article included photographs of Appellant and his co-defendant and discussed the prevalence of the Tango Blast gang and its dangerous activities in Lubbock. Appellant asserted that, although the article purported to be a news story about gang activity, its second sentence began a discussion of the instant case, including crime scene evidence and witness statements to police. Appellant argued that the article went on to state that Appellant and his co-defendant, who were awaiting trial on charges of capital murder in this case, were both believed to be associated with Tango Blast.

Appellant also explained in this motion that a story on KCBD's 10:00 p.m. television news had discussed the same subject of gang activity in Lubbock. That story made no overt reference to the instant case, but it featured photographs of Appellant and his co-defendant. Additional versions of that story appeared online and in later broadcasts. One such version included video footage from the crime scene, photos of the victim, and photos of Appellant

(...continued)

1. That there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial; and

2. That there is a dangerous combination against him instigated by influential persons, by reason of which he cannot expect a fair trial.

and his co-defendant. The Texas Tech University newspaper also published a version of this story on its website.

Appellant noted in the motion that, as of the April 25th filing date, "individual sequestered voir dire is in progress and nine jurors have been selected." He moved the court to dismiss those nine jurors and the remainder of the venire and to change venue to a county outside the coverage area of the Lubbock County news media. Alternatively, he moved the court to inquire whether the nine selected jurors had seen any media coverage concerning this case since March 13, 2014 (the date these jurors completed their questionnaires), and to give counsel an opportunity to question them regarding any effect that the media coverage had had on them.

Appellant attached two affidavits from Lubbock County residents to the motion. The affiants recited that there existed in Lubbock County "so great a prejudice against . . . the said[] defendant[] that he cannot obtain a fair and impartial trial of said cause in Lubbock County." Appellant also attached print-outs of two of the online articles, as well as DVDs of KCBD's 10:00 p.m. television news story and another television news story. In response, the State filed three affidavits from Lubbock County residents which recited that, in each affiant's opinion, "there is not so great a prejudice that prevents [Appellant] from receiving a fair trial in Lubbock," and Appellant "can receive a fair trial in Lubbock County."

At a hearing on April 28, 2014, the trial judge explained to the parties that he would swear in the nine selected jurors and ask them as a group whether anyone had heard or read

anything in the news during the preceding week. If any of them responded affirmatively, he would question those jurors individually. The parties assented to this procedure and the jurors entered the courtroom.

The judge then swore in the nine jurors and explained to them that a prospective juror had seen a recent news story and, based on that story, had formed an opinion concerning Appellant's guilt or innocence. The judge repeated his admonition to the jurors that they should not view any media coverage about the case. He then stated that, "with regard to the news coverage," he could either sequester the jury until the case was complete or grant a change of venue. He noted that there had been little news coverage of the case before jury selection began, but that the coverage from the previous week might "change things." He expressed the hope that he would not need to order a change of venue. The judge then asked the jurors as a group if anyone had seen anything on the news the previous week. No one responded affirmatively. He reminded them again to avoid media coverage of the case.

After the jurors left the courtroom, a member of the defense team testified that he had discussed the motion for change of venue with Appellant on April 25th and that Appellant had signed it. Defense counsel then argued that the recent media coverage had prejudiced Appellant by linking him to a dangerous gang and by discussing the crime scene and witness statements. Defense counsel asserted that it was also apparent that law enforcement officials had been providing information about the case to the media. The prosecutor responded that she believed that a fair and impartial jury could still be selected. The trial court denied the

motion for change of venue, but stated that, if it became apparent "that more than just one person on the venire panel has viewed or read any of this, the Court will reconsider its ruling." The judge reiterated that "Rhonda" was contacting prospective jurors and reminding them "not to read or view anything in the news."

On May 1st, the twelfth juror was selected and sworn, and voir dire of prospective alternate jurors commenced. At a hearing on May 2nd, defense counsel stated that he was renewing the motion to transfer venue and that he intended to file a supplemental motion due to additional media coverage. He noted that the May 2nd edition of the Lubbock Avalanche Journal featured a front-page article about gang tattoos and paraphernalia. He pointed out that a Lubbock police officer who had been designated by the State as an expert witness in this case was quoted in the article, discussing the Tango Blast gang and gang tattoos. Counsel acknowledged that the news article did not refer to Appellant but noted that it referred to Tango Blast, which had been connected to Appellant in previous news coverage. Counsel also noted that KCBD, the same news outlet that had run the previous online and television news stories, had run a story on the 6:00 p.m. television news that "rehashed" the trial court's denial of his motion for change of venue and featured video footage of Appellant being escorted by police officers while handcuffed and wearing an orange jumpsuit. The prosecutor asserted that the Lubbock Avalanche Journal story about gang tattoos was not tied to the instant case and, therefore, the officer's comments that appeared in it did not

necessarily violate the trial court's gag order. The trial judge stated that he would take up the matter when Appellant filed his supplemental motion for change of venue.

On May 5, 2014, Appellant filed a second motion for change of venue.[13] In it, he re-urged his previous motion and described two subsequent news stories, which included comments provided by law enforcement officers, one of whom was designated as an expert witness in the instant case. Appellant asserted that the officers' comments violated the gag order. He reiterated in the motion that a KCBD television news story discussed the denial of the first motion to change venue and featured video footage of Appellant being escorted by officers while handcuffed[14] and wearing an orange jumpsuit. Appellant asserted that these news stories and the officers' comments further prejudiced his ability to receive a fair trial. Appellant requested that the court dismiss all twelve seated jurors and the remainder of the venire and change venue to a county outside the coverage area of the Lubbock County news media. Alternatively, Appellant requested that the court continue the case until a later time when the impact of the prejudicial media coverage would be diminished.

---

[13] Due to concerns about media coverage during voir dire, defense counsel began "bench-filing" pleadings directly with the judge, rather than filing them with the clerk's office, at around the same time counsel requested the "gag order." In his reply brief, Appellant acknowledges that the second motion for change of venue was "bench filed" on May 5, although it was not file-stamped until May 12.

[14] Although defense counsel used the term, "handcuffed" during the hearing, he used the term, "shackled," in his written second motion. Broadly speaking, a handcuff may be a type of shackle, but to the extent that counsel intended to convey in his written motion that Appellant was visibly restrained by something in addition to handcuffs, our independent review of the video confirms that Appellant was handcuffed, with his hands in front of him. A belly chain connected the handcuffs to his waist. Appellant was not otherwise visibly restrained.

This second motion was accompanied by affidavits of two Lubbock County residents that were substantively the same as the affidavits Appellant had attached to his first motion. Appellant also provided a DVD of the KCBD television news story. That story primarily concerned the trial court's gag order and Appellant's motion for change of venue. It displayed some of the same photographs that had been featured in the earlier stories, as well as a brief, silent video of Appellant in an orange jumpsuit, handcuffed, being escorted from a police vehicle by two police officers.

Appellant also provided photocopies and a print-out of the Lubbock Avalanche Journal news article, titled, "Lubbock/Local expert says face tattoos growing trend among gangs." That article quoted a Lubbock police officer, Lieutenant Billy Koontz, who stated that prison members of the West Texas gang, which was part of the Tango Blast network, sometimes used Texas Tech's Double T logo, or a five-pointed star, as a face tattoo denoting their gang affiliation. The article stated that Koontz had "on many occasions" testified as an expert in gang tattoo identification for the District Attorney's office. As an expert witness, Koontz would tell the jury what a defendant's tattoos "stand for." Koontz noted that not all inmates who obtained gang tattoos were gang members or hardened criminals. On the other hand, Koontz stated, a defendant's gang tattoos did not "help when facing a jury," and prosecutors would use a defendant's gang involvement against him at punishment. The

article also quoted the Lubbock County Detention Center's chief deputy, Cody Scott, who stated that an inmate's tattoos would be catalogued at the jail and used for identification.[15]

An alternate juror was selected and sworn on May 5th. At a hearing on May 6th, the trial court denied Appellant's second motion for change of venue, noting that the court had reviewed all of the evidence and that nothing in the Lubbock Avalanche Journal story was connected to Appellant or his co-defendant. Voir dire for alternate jurors then continued, but at the end of the day, the parties agreed to go to trial with only one alternate juror. The guilt-innocence phase began on May 13th. That day, before the jury entered the courtroom, defense counsel re-urged both motions to transfer venue, and the trial court again denied them.

A proceeding may be transferred to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial. *See Skilling v. United States,* 561 U.S. 358, 378 (2010). A trial court may grant a change of venue if the defendant establishes that "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial," or that "there is a dangerous combination against him instigated by influential persons, by reason of which he cannot expect a fair trial." Art. 31.03(a); *see Gonzalez v. State,* 222 S.W.3d 446, 449 (Tex. Crim. App. 2007). We review a trial court's ruling on a motion for change of venue for an abuse of discretion. *Freeman v. State,* 340 S.W.3d 717, 724 (Tex. Crim. App. 2011). If the trial court's decision

---

[15] Neither Koontz nor Scott testified at Appellant's trial.

falls within the zone of reasonable disagreement, it will be upheld. *Buntion,* 482 S.W.3d at 71.

To justify a change of venue based upon media attention, a defendant must show that the publicity was pervasive, prejudicial, and inflammatory. *Salazar v. State,* 38 S.W.3d 141, 150 (Tex. Crim. App. 2001). Widespread publicity alone is not inherently prejudicial. *Gonzalez,* 222 S.W.3d at 450; *see also Renteria v. State,* 206 S.W.3d 689, 709 (Tex. Crim. App. 2006). "Prominence does not necessarily produce prejudice, and juror *impartiality,* we have reiterated, does not require *ignorance.*" *Skilling,* 561 U.S. at 381 (emphasis in original). Extensive knowledge of the case or defendant in the community as a result of pre-trial publicity is not sufficient without some showing of prejudicial or inflammatory coverage. *Gonzalez,* 222 S.W.3d at 450; *Faulder v. State,* 745 S.W.2d 327, 338-39 (Tex. Crim. App. 1987). "A defendant must demonstrate an 'actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come.'" *Renteria,* 206 S.W.3d at 709 (quoting *DeBlanc v. State,* 799 S.W.2d 701, 704 (Tex. Crim. App. 1990)). We generally consider news stories that are accurate and objective in their coverage not to be prejudicial or inflammatory. *Gonzalez,* 222 S.W.3d at 451.

In examining whether pre-trial publicity is prejudicial and inflammatory, a trial court may take three matters into consideration: 1) the nature of the publicity; 2) any evidence presented at a change of venue hearing; and 3) testimony received from venire members at voir dire. *Id*. We afford great deference to the trial judge, who heard the responses of the

jurors during voir dire, because he was in a better position than we are to resolve issues involving testimony and other questions of fact by observing the demeanor of witnesses and scrutinizing their veracity face-to-face. *See id.* at 452.

The record reflects that the main subject of the April 23rd news stories was a recently-released DPS report about gang violence in Texas. The KCBD online story described the Tango Blast gang as "one of the most predominant and dangerous gangs in Texas," and quoted a DPS sergeant who stated that the gang had been active in Lubbock for some time. The story mentioned that Appellant and his co-defendant, who were charged with capital murder following a restaurant robbery, were believed to be members of Tango Blast. The story briefly summarized the facts of the offense and featured photographs of Appellant and his co-defendant. One KCBD television news story repeated the content of this online story and featured additional photographs of Appellant, his co-defendant, and the victim. Another television news story concerning the DPS report did not expressly discuss the offense or Appellant, but the accompanying graphics included Appellant's and his co-defendant's photographs and names. These news stories are the type of accurate and objective coverage that we generally consider not to be prejudicial or inflammatory. *See Gonzalez,* 222 S.W.3d at 451.

The May 2nd Lubbock Avalanche Journal story did not refer to Appellant or this case, but generally discussed gangs and gang tattoos in an informative manner. *Cf. Salazar,* 38 S.W.3d at 150 (holding that the trial court did not abuse its discretion by denying a change

of venue when most of the complained-of publicity did not mention the Appellant's case specifically and was informative rather than prejudicial). Additionally, the May 2nd KCBD news story reported the denial of Appellant's motion to transfer venue in an informative manner. The brief video of Appellant was not prejudicial or inflammatory. *See, e.g., Bell,* 938 S.W.2d at 46 (noting that the fact that many people in the community knew appellant had received two death sentences which had been overturned did not merit a change of venue because such knowledge did not amount to per se prejudice).

Appellant identifies a number of venire members who acknowledged during voir dire that they had heard news reports about this case. However, Appellant identifies only three venire members who stated that, as a result of these news reports, they had formed opinions about Appellant's guilt. None of the three was selected for the jury. On April 28, 2014, the trial judge asked the nine members of the jury who had already been selected and admonished not to view news coverage of the case whether they had seen "anything on the news" during the previous week. None of them responded affirmatively. The trial court again admonished them not to view any news coverage, and Rhonda contacted the remaining venire members to instruct them not to view news coverage of the case. The twelfth juror was selected on May 1st, and, like the jurors who had been selected before him, he was admonished to avoid news coverage of the case. There is no evidence in the record that any juror was aware of the May 2nd news coverage.

Appellant nevertheless asserts that he was entitled to a change of venue as a matter of law because the State did not file affidavits controverting his second motion for change of venue and the trial court did not, he alleges, have a hearing on the second motion. *See, e.g., McManus v. State,* 591 S.W.2d 505, 516 (Tex. Crim. App. 1979) (explaining that a defendant would be entitled to a change of venue as a matter of law if no controverting affidavit was filed by the State because, absent controverting evidence, there would be no issue of fact to resolve). However, as discussed above, by the time Appellant filed his second motion, the parties had already presented controverting evidence and the trial court had already held a hearing on Appellant's first motion. The State's failure to re-file county resident affidavits responding to the evidence that Appellant presented in support of his second motion did not render Appellant's newly-presented evidence "uncontroverted." *Cf. id*.

Further, the record reflects that the trial court heard Appellant's second motion for change of venue and his arguments, although the "hearing" was somewhat informal. *See id.* (noting that, where the State failed to file controverting affidavits, a defendant may waive his right to a change of venue as a matter of law if he proceeds to a hearing without objecting that there is no issue of fact to be tried). The trial court concluded that the Lubbock Avalanche Journal story was not connected to Appellant. The trial judge did not expressly address Appellant's argument concerning the KCBD television news story that contained

video footage of him in an orange jumpsuit and handcuffs, but the judge stated that he had considered "all of the evidence" before he denied the second motion.

Appellant also argues that the news coverage in this case was prejudicial and inflammatory because the headlines concerning Texas gang activity did not announce that the news stories that followed would discuss him or this case. Therefore, he asserts, even well-intentioned venire members and jurors might have begun viewing those news stories before discovering that the stories concerned this case. It is true that the two KCBD news stories that prompted Appellant's first motion for change of venue followed a pattern of discussing the Texas DPS gang report – the main focus of the story – and then pivoting to Appellant's and other Lubbock-area criminal cases that might be gang-related. This pattern could have operated to expose Appellant's alleged gang affiliation contemporaneously with the revelation that the story concerned Appellant, so that the viewer would not discover that the story concerned Appellant until some information about him had already been conveyed. However, the news stories were accurate and objective in their coverage, and the information that they conveyed – that Appellant was believed or alleged to belong to a dangerous gang – was not itself prejudicial and inflammatory. *See Gonzalez,* 222 S.W.3d at 451. Moreover, because evidence of Appellant's gang affiliation was presented at trial, we do not hold that publishing this information was by itself prejudicial and inflammatory. *See id.*

Additionally, Appellant alleges that law enforcement officials disclosed details about the offense to the media and later violated the gag order by discussing gang tattoos. Relying

on *Henley*, Appellant points to the connection of government officials with the release of pre-trial publicity as a factor we should consider in reviewing the trial court's ruling on his motions for change of venue. *See Henley v. State,* 576 S.W.2d 66, 71-72 (Tex. Crim. App. 1978). However, *Henley* concerned the trial court's refusal to hold a hearing or admit evidence concerning a defendant's motion for a change of venue, and it is therefore not instructive. *See Gonzalez,* 222 S.W.3d at 451 (concluding that *Henley* was not instructive because we resolved that case based on the trial court's failure to hold a hearing or allow the introduction of evidence on pre-trial publicity; the *Henley* opinion listed, but did not actually apply, some factors relevant to a trial court's venue decision).

In this case, the trial judge expressed his displeasure with the Sheriff's Office, which did not acknowledge the court's "gag order" or circulate the court's instructions to its employees until after the court contacted the Sheriff directly. However, the court did not find that any law enforcement officers had released confidential or otherwise prejudicial information to the media. The court further noted that law enforcement officials' communications with the media that occurred after the issuance of the gag order did not concern Appellant or this case. Thus, the trial court did not abuse its discretion by declining to find that any government officials' conduct merited a change of venue.

To summarize, Appellant received hearings and presented evidence on his motions to change venue. The trial court reviewed affidavits from county residents as well as the content of the media coverage. In addition, the trial court heard from selected jurors and

venire members concerning their exposure to the media coverage. We conclude that the trial court could reasonably find that Appellant's affidavits from county residents were unpersuasive, the news coverage was not inherently prejudicial and inflammatory, and jurors' and venire members' credible statements during voir dire indicated that the pre-trial publicity had not impeded Appellant's ability to select a fair and impartial jury. The trial court did not abuse its discretion by denying Appellant's motions for change of venue. Point of error three is overruled.

## EVIDENTIARY RULINGS

In his fourth point of error, Appellant asserts that the trial court erred in excluding, during the punishment phase of trial, mitigating evidence concerning intrafamilial sexual abuse, violence, and alcohol abuse, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Appellant complains specifically that the court excluded: (1) his brother Michael's testimony concerning sexual abuse within the family; (2) his maternal aunt Delores's testimony concerning her father's physical and verbal abuse of her mother and the sexual abuse of her sister Alma; and (3) his mother Rosalinda's testimony "concerning the problems that alcohol had wrought in the lives of" Appellant's brothers, Michael and Eric.[16]

---

[16] Except for Appellant's co-defendant, Sesilio Lopez Jr., who we refer to as "Lopez," we will refer to Appellant's family members by their first names because many of them share the same last name.

The record reflects that Appellant's brother Eric testified before the jury that he was the eldest of three brothers. Eric stated that he was about three years older than Appellant's brother Michael and about eight years older than Appellant. Eric recalled that Appellant was a happy-go-lucky child. Their parents divorced when Appellant was about three years old, and the boys subsequently lived with their mother, Rosalinda. She remarried when Appellant was five or six. The boys' stepfather, Albert, was a good father figure to them. Eric recalled that Albert would take Eric to play golf and he encouraged him to do well in school. Eric stated that his experience with Albert had motivated him to complete high school and attend college. However, Albert was in the boys' lives for only about four years before he separated from their mother. They saw him very rarely after that. Eric noted that Appellant, who was much younger than Eric, would not have experienced the same positive influence from the boys' time with Albert.

Eric testified that, after Albert moved away, the boys continued living with Rosalinda. She left them generally unsupervised while she worked long hours and attended GED classes. Appellant became more introverted around this time. Eric was completing high school by then, and he did not pay much attention to his younger brothers. Around the time Eric graduated from high school, his aunt's husband, Sesilio Lopez Sr., left his aunt and moved into Rosalinda's house. Sesilio had issues with drugs and alcohol. Eric's understanding was that Sesilio made a living "primarily [by] narcotics trafficking." Eric

explained that one of Sesilio's sons (Sesilio Lopez Jr.) was Appellant's co-defendant in this case.

Eric stated that he had not seen Appellant much since finishing high school. Eric testified that, after he graduated from high school, he moved out of Rosalinda's house and attended college for two and one-half years. He then served in the Navy for four years before finishing college. Eric stated that he still saw his mother and brothers on holidays, when their main activities were cooking and drinking alcohol.

Eric also testified that the boys' father, Augustine, was a "chronic alcoholic." Eric denied being an alcoholic but acknowledged that he liked to drink, saying that he would have a drink before going to bed. Eric stated that several of his maternal aunts and uncles had been to the penitentiary; among his uncles, only the youngest, Larry, had avoided prison. Eric recalled that most of his family members' offenses were narcotics-related. Eric also testified that his brother Michael had issues with drugs and alcohol. At the time of trial, Michael was in a correctional facility for a "parole violation because of alcohol."

During cross-examination, Eric stated that he had been married and that he had a little girl for whom he helped provide. Eric stated that Appellant had seven children. When the prosecutor asked Eric if Appellant "[took] care of and provide[d] for" those children, Eric stated that he did not know specifically, "but [he] would doubt it." Eric also acknowledged that his mother had modeled a good work ethic for her sons.

Appellant's mother, Rosalinda, testified that her parents moved around a lot in West Texas when she was a child. Her mother was a homemaker and her father was a farm worker. Rosalinda was one of ten children. All of the children worked on the farms with their father. Rosalinda recalled that she married Augustine when she was nineteen and he was twenty. Augustine was in the Air Force at the time. He stayed in the service for twelve years, but when he got out, he became an alcoholic and "didn't work anymore." Alcohol took over his life. Augustine was already an alcoholic when Appellant was born. Rosalinda recalled that Augustine was not a "mean drunk," but he liked to argue. They divorced in 1983, when Appellant was three or four years old.

Rosalinda further testified that Appellant had seven children. She stated that she spent a lot of time with some of them, but she never saw others. Appellant's oldest child, Aaron, was autistic and had birth defects. Rosalinda acknowledged that Appellant neither provided for his children nor fulfilled the role of a father for them. She stated that he was a good father when he spent time with his children, but he spent very little time with them.

Rosalinda testified that she considered Eric to be an alcoholic because he drank every day. When defense counsel asked her if alcohol had "interfered with some parts of Eric's life," the prosecutor objected on the basis of relevance. The trial court sustained the objection. Rosalinda went on to testify that Eric lived with her periodically, most recently from 2009 to 2011.

Rosalinda also testified that Michael was in prison at the time of trial because of DWIs and a probation revocation. When defense counsel asked Rosalinda to "tell the jury about alcohol in Michael's life," the prosecutor objected to relevance. The trial court instructed counsel to "rephrase." Counsel then asked Rosalinda if alcohol had "caused criminal problems for Michael in his life," and she responded, "Yes." She stated that alcohol had caused Michael to get into trouble, such as "[j]ail, prison, accidents." Michael had also been convicted of drug offenses.

Rosalinda testified that her father also had issues with alcohol while she was growing up. She described him as "a weekend drinker." Every Friday when he finished working, her father and the family would drive to Lubbock to get beer. They would bring it home and her father would drink all weekend. When Rosalinda was a young woman, her father was killed in a card game. Rosalinda testified that all of her siblings "drank," but she was not sure if they had "problems" with alcohol because she did not see them very often. She acknowledged that many of them had been to prison. Her brothers had gone to prison for drug offenses, and her sister Alma had gone to prison for shoplifting.

Rosalinda testified that she met her second husband, Albert, when they worked for the same company in Austin. She recalled that he was "a great father to" her children. They married in 1986. Albert joined the military, and when he was transferred to Massachusetts, the family moved there with him. Later, when Albert was transferred to California, Rosalinda and Albert separated. Rosalinda moved with her sons to Copperas Cove, Texas.

Appellant was in the fifth grade then. Appellant began skipping school because Rosalinda was "working nights" and not around to supervise him. He stopped going to school altogether when he was fifteen. Rosalinda and Albert finally divorced in the late 1990s.

Rosalinda acknowledged that Sesilio was a drug dealer who had been married to her sister when he and Rosalinda began having a romantic relationship. At the time of trial, Sesilio was in prison for drug dealing.

On cross-examination, Rosalinda stated that Appellant had issues with alcohol and drugs. She stated that he had had a good relationship with his father, Augustine. She and Augustine taught Appellant right from wrong. The prosecutor elicited Rosalinda's acknowledgment that even though all three of her sons had alcohol problems, only Appellant had killed someone. When the prosecutor asked Rosalinda if she took better care of Appellant's children than Appellant did, she acknowledged that that was true.

Outside the jury's presence, defense counsel made a "bill of review"[17] with Rosalinda. First, counsel asked her about the problems that alcohol had caused for Eric. Rosalinda testified that there was a time when Eric had difficulty maintaining stable employment. When he lived with her from 2009 to 2011, he was up all hours "and he drank." Rosalinda stated that Eric's alcohol use had caused problems in both of his marriages.

---

[17] *See* TEX. R. EVID. 103(a)(2) (concerning offers of proof); Rule TEX. R. APP. P. 33.2 (prescribing bills of exception); *Reyna v. State,* 168 S.W.3d 173, 176 & n.8 (Tex. Crim. App. 2005) ("We have held, and the Rules of Evidence make clear, that to preserve error in the exclusion of evidence, the proponent is required to make an offer of proof and obtain a ruling.").

Rosalinda also testified that, in her opinion, Michael was an alcoholic. Michael was in prison at the time of trial because his probation on his third DWI had been revoked. Rosalinda testified that alcohol had caused problems for Michael, in that he was unable to "hold legitimate jobs" and had trouble in his family relationships. The trial judge opined that Rosalinda's testimony for the bill of review largely duplicated Eric's testimony except for revealing a second marriage. The court again sustained the prosecutor's objection to the relevance of the proposed testimony.

Back in the jury's presence, Appellant's maternal aunt Delores testified that when she was growing up, she and her siblings worked in the fields with their father. Her father treated "the boys and the girls" differently. Delores, who was younger than Rosalinda, stated that Delores took on the role of protector because her father got violent when he drank. At that point, the prosecutor asked to approach the bench and the trial court excused the jury. The prosecutor argued that Delores's childhood was not relevant to Appellant. Defense counsel responded that his "obligation [was] to bring forward generations of family history to establish Appellant's upbringing and character." Counsel asserted that a family history of violence and alcohol abuse was relevant to that. The court sustained the prosecutor's objection to testimony concerning Appellant's grandfather's behavior unless Appellant had personal knowledge of it. Defense counsel asked to make a bill.

Outside of the jury's presence, Delores testified on a "bill of review" that her father became physically and verbally abusive of their mother when he was drunk, and he also

abused the children. Once when their mother had gone to San Antonio for surgery, he sexually abused Delores's older sister, Alma, and Delores had to "step forward and put a stop to it." Delores acknowledged that Rosalinda did not learn of that incident until Delores told her about it, after Appellant was charged with this offense. Delores did not recall if the other children suffered any abuse from their father. Delores recalled that many of her brothers went to prison for drug and DWI offenses. Her father was murdered in 1984. At the end of Delores's bill, the trial court denied defense counsel's request to present her testimony to the jury.

Back in the jury's presence, Delores identified her siblings in a photograph that defense counsel showed her. She stated that four of her brothers had been to the penitentiary for drug offenses or DWIs. Her sister Alma also had been to prison, but Delores and her other sisters had not. Sesilio had been married to Delores's sister Mary at one time and later had lived with Rosalinda. Delores recalled that Rosalinda divorced Augustine over his alcohol abuse. After Rosalinda separated from her second husband, Albert, she worked very hard and did not spend time with her sons. She had little free time, and she spent any free time that she did have "partying." Rosalinda sent Michael to live with Delores in Fort Worth because he was getting into fights at school. He lived with Delores for a year while he finished high school, and then he "went back to living with Rosa" after Rosalinda and Appellant moved to Fort Worth.

Before Appellant's brother Michael testified, the prosecutor stated at the bench that he believed Michael would testify that he was sexually abused as a child by one of his uncles. The prosecutor noted that the State had a jail visitation video in which Appellant told his mother that he was never sexually abused. The prosecutor objected to the relevance of Michael's testimony concerning his own sexual abuse. Defense counsel requested that the parties approach the bench and address the matter if it came up during Michael's testimony, and the trial court agreed.

Michael then testified before the jury that he was serving a prison sentence for his fourth DWI, having had his probation revoked. He had also served time for a federal charge of conspiracy to possess marijuana with intent to deliver. He recalled that his parents divorced when he was about six years old. He testified that his stepfather, Albert, was a good provider and a good man, but he was "hands-off" as a father figure; he did not play games with the boys and he left their discipline up to their mother. The boys did not see Albert after they moved with their mother to Copperas Cove. Michael recalled that they did not have much contact with their father Augustine because he "was suffering from his own addiction with alcoholism." Michael recalled seeing their father at Eric's high school graduation but could not remember seeing him at other times.

Michael testified that Rosalinda worked a lot and was not around much when they lived in Copperas Cove. Eric and Michael were old enough to get themselves to and from school, and they were responsible for taking care of Appellant. Then Eric graduated from

high school and left home. Michael started spending time with guys who were skipping school and partying on the weekends. He also "loved women," and his interactions with them led to him getting into fights with other men. Appellant witnessed a lot of the conflict between Michael and guys who were mad at him. One time, a group of guys who were mad at Michael threatened the whole family. They showed up outside the house, and one of them threw a manhole cover through Appellant's bedroom window. Appellant was at home when that happened.

Michael testified that, as a result of that incident, Rosalinda sent Michael to live with Delores in Fort Worth. He graduated from high school in Fort Worth and then joined the Army. Nine months later, he was discharged because of his drinking and fraternizing with enlisted women. By then, Rosalinda was living in Fort Worth, and Michael moved into her house. Appellant still lived with Rosalinda. Sesilio was also spending time there. Michael lived there for several months while he looked for work. Eventually, he moved to Eldorado and worked "out there" for a while.

Michael further testified that he returned to Fort Worth after he left that job, and he supported himself by selling marijuana. He worked for Sesilio, selling methamphetamine, cocaine, or acid. Michael stated that he has "always been an alcoholic," and his memory is sketchy as a result. He started drinking in high school and was an alcoholic by the time he was fifteen or sixteen. Michael testified that his father, uncles, and cousins were also alcoholics. He recalled that alcohol was the center of family get-togethers. Michael also

recalled that Appellant used drugs, including methamphetamine, from around the time Appellant was sixteen years old. Michael, his cousins, and his uncles were all involved in drug dealing, and they had been to prison for drug offenses. Only Michael's uncle Larry had not gone to prison.

Michael testified that, while his mother and Sesilio were living together, one of Sesilio's sons, Jonathan, shot and wounded a family friend who owed Jonathan money. Jonathan left the area, but Michael feared for Rosalinda's safety because "everyone" associated Rosalinda's house with Jonathan, making it a likely target for retaliation. Michael told Rosalinda to leave town for the weekend, and she did. Michael was living in his own apartment by then, but he and Appellant armed themselves with guns and spent the night at Rosalinda's house to guard it.

Michael testified that while he and Appellant were drinking in the living room that night, their dog growled and they heard gunshots. Michael saw "a big ball of flame coming through the hallway enveloping the living room." The gunshots kept coming, the windows were shattering, and it sounded like someone was kicking in the front door. "It sounded like a war." Michael and Appellant fled to the kitchen and then they moved into the garage. They were planning to escape through the garage, but when they opened the garage door, no one was there. They surveyed the damage and called 9-1-1. The police investigation revealed that gasoline had been poured on the front of the house. "[T]he gunshot patterns" indicated that there had been five shooters, with "[t]hree firing 12 gauge shotgun," and

"[t]wo firing 9mm. There was [sic] 60 rounds expended from the 9mm." Michael testified that, after that incident, Appellant became "much more apprehensive, much more vigilant. Maybe didn't trust people as much."

At the bench, defense counsel renewed his proffer of Michael's sexual abuse evidence, and the prosecutor objected that Appellant was not aware of that abuse when he was a child and had expressed shock when he learned of it while in jail awaiting trial. The trial court sustained the objection and stated that defense counsel could make a bill at the end of Michael's testimony.

Before the jury, the State cross-examined Michael about prison conditions and his experiences with other inmates. Michael stated that he had been housed in sixty-man dormitories and that prison is a very violent place. He affirmed that prison inmates are not generally aware of other inmates' offenses of conviction. At the time of trial, Michael was housed in an in-prison therapeutic community designed to modify negative behaviors and help him address his "issues."

Outside the jury's presence, defense counsel made a "bill of review." Michael testified that Larry, who was his only uncle who had avoided prison, had "[s]exually abused" him around the time Michael's parents divorced. Michael testified that he had been trying to deal with that experience through the prison "rehab" program. He acknowledged that Appellant was not aware of that abuse until Michael told him about it later. Defense counsel asked the trial court to admit Michael's testimony before the jury, "to establish the character

background of the family . . . in which [Appellant] was raised, and that influenced his background, character."

The prosecutor then cross-examined Michael, who stated that he had told Appellant about the sexual abuse on several occasions. Michael was surprised to learn that, when Rosalinda told Appellant about the sexual abuse in a jail conversation, Appellant acted like he had not known about it before. Michael recalled that he had told Appellant about it some years ago. The trial court denied defense counsel's request to elicit this testimony before the jury.

On appeal, we review a trial judge's evidentiary rulings under an abuse-of-discretion standard. *Bowley v. State,* 310 S.W.3d 431, 434 (Tex. Crim. App. 2010). If the trial court's decision was within the bounds of reasonable disagreement, the appellate court should not disturb it. *Shuffield v. State,* 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). We will sustain the trial court's decision if it was correct on any applicable theory of law. *Prystash v. State,* 3 S.W.3d 522, 527 (Tex. Crim. App. 1999). This is true even if the judge failed to give a reason or gave the wrong reason for the ruling. *Bowley,* 310 S.W.3d at 434.

Relevant evidence is admissible unless otherwise provided by the state or federal constitution, a statute, the rules of evidence, or other rules prescribed under statutory authority. TEX. R. EVID. 402. Irrelevant evidence is inadmissible. *Id.* At the punishment phase of a capital trial, "evidence may be presented by the state and the defendant or the defendant's counsel as to any matter that the court deems relevant to sentence, including

evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty." Article 37.071, § 2(a)(1).

Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value. *Tennard v. Dretke,* 542 U.S. 274, 284-85 (2004); *see also* TEX. R. EVID. 401. To be relevant, the evidence need not by itself prove or disprove a particular fact of consequence; evidence is relevant if it provides a small nudge toward proving or disproving a fact of consequence. *Ex parte Smith,* 309 S.W.3d 53, 61 (Tex. Crim. App. 2010). Thus, the trial court should admit evidence that a juror could reasonably find warrants a sentence less than death. *Hernandez v. State,* 390 S.W.3d 310, 324 (Tex. Crim. App. 2012) (citing *Tennard,* 542 U.S. at 284). Except as otherwise provided by a statute or rule, a jury is entitled to have before it "all possible relevant information about the individual defendant whose fate it must determine." *Shuffield,* 189 S.W.3d at 793 (quoting *Sells v. State,* 121 S.W.3d 748, 766 (Tex. Crim. App. 2003)).

In this case, the record reflects that Michael's proffered testimony was that his uncle, Larry, had sexually abused Michael around the time that Michael's parents divorced. The prosecutor objected to the relevance of Michael's testimony concerning his own sexual abuse, noting that Appellant was not aware of that abuse until many years later. The trial court properly sustained the objection. "The fact that others in the appellant's family were abused does not by itself make the appellant more or less morally culpable for the crime for

which he was on trial." *Shuffield,* 189 S.W.3d at 793. Nor does it make a jury's finding of mitigation any more or less probable than it would be without the evidence. *Id.* Appellant did not offer evidence that he, personally, had been sexually abused or had witnessed Michael's abuse. *See id.*

Appellant asserts that this Court has implicitly recognized that sexual abuse of a defendant's sibling may be mitigating. *See Ex parte Gonzales,* 204 S.W.3d 391, 399 (Tex. Crim. App. 2006). However, our opinion in *Gonzales* did not concern the trial court's evidentiary rulings; rather, our opinion concerned whether trial counsel's failure to discover mitigating evidence before trial constituted ineffective assistance of counsel. *Id.* We did not state that evidence concerning the sexual abuse of Gonzales's sister was, by itself, admissible mitigating evidence as to Gonzales. *Cf. Shuffield,* 189 S.W.3d at 793. Rather, we concluded that the evidence and arguments at the punishment phase of the trial would have been significantly different if trial counsel had discovered and presented the mitigating evidence adduced at the habeas hearing. *Gonzales,* 204 S.W.3d at 399.

In *Gonzales,* the newly discovered evidence included evidence that Gonzales's father had repeatedly sexually abused Gonzales and threatened to kill him and his mother if Gonzales ever reported the abuse, as well as evidence that Gonzales's father had sexually molested Gonzales's older sister numerous times. *Id.* Thus, although we listed the sexual abuse of Gonzales's sister among the items of mitigating evidence that counsel failed to

discover, we did so in the context of describing the circumstances of Gonzales's own childhood.

Further, *Gonzales* is distinguishable from this case on its facts.  In that case, the evidence was that Gonzales and his sister lived with their abusive father until their parents divorced when Gonzales was fourteen years old.  *See id.* at 399.  It was Gonzales's sister's outcry to their mother that prompted the divorce.  *Id.* at 395.  In the instant case, only two pieces of evidence concerned Larry:  (1) he was the only one of Rosalinda's brothers who had not gone to prison; and (2) on one occasion, he had sexually abused Appellant's then-nine-year-old brother Michael.  Appellant, who would have been three or four years old at the time of that incident, did not know about the abuse until many years later.  None of the punishment evidence indicated the extent, if any, of Larry's involvement in or influence on Appellant's childhood.  Without more, the trial court could reasonably have concluded that the proffered testimony concerning Larry's sexual abuse of Michael did not provide relevant information about Appellant.  The trial court did not abuse its discretion by sustaining the prosecutor's objection to Michael's testimony.

For similar reasons, the trial court did not abuse its discretion by excluding Appellant's aunt Delores's testimony concerning her father's physical and verbal abuse of her mother when he was drunk. We will assume for the sake of argument that evidence that Rosalinda witnessed such abuse might have affected her ability to parent Appellant and, therefore, might have been relevant in mitigation.  When Delores testified, Rosalinda had

already testified that her father had issues with alcohol and that he would drink all weekend. However, Rosalinda did not testify that her father had physically and verbally abused her mother. Appellant has not explained how, under these circumstances, testimony that Rosalinda's sister Delores witnessed such abuse would provide relevant information about Appellant.

Additionally, the trial court did not abuse its discretion by excluding Delores's testimony concerning her father's sexual abuse of her older sister, Alma. Delores testified that Rosalinda did not know about that incident until Appellant was in jail awaiting trial for the instant offense. *Cf. Shuffield,* 189 S.W.3d at 793 (finding that the trial court's decision to exclude the defendant's uncle's testimony that the uncle had been sexually abused by a great-uncle was within the bounds of reasonable disagreement). Delores also stated that she did not know whether her father had abused any of her siblings other than Alma. Thus, without more, Delores's proffered testimony concerning her father's sexual abuse of Alma did not provide relevant information about Appellant.

Further, the trial court did not abuse its discretion by excluding Rosalinda's testimony "concerning the problems that alcohol had wrought in the lives of" Appellant's brothers, Eric and Michael. Before Rosalinda testified, Eric testified that he was eight years older than Appellant. Eric stated that he did not pay much attention to his brothers while he was in high school, and Eric had not seen Appellant very much since finishing high school. Eric stated that he was not an alcoholic but he acknowledged that he liked to drink and would have a

drink before going to bed. Rosalinda testified before the jury that she considered Eric to be an alcoholic because he drank every day. When defense counsel asked Rosalinda if alcohol had "interfered with some parts of Eric's life," the prosecutor objected on the basis of relevance, and the trial court sustained the objection. Rosalinda went on to testify before the jury that Eric lived with her periodically, most recently from 2009 to 2011.

The trial court's decision to exclude Rosalinda's testimony concerning the effects of alcohol on Eric's life fell within the zone of reasonable disagreement. Eric's testimony established that he did not interact with Appellant very much after Eric finished high school. Therefore, the trial court could reasonably conclude that whatever alcohol-related problems Eric had later in life were not relevant to Appellant.

Rosalinda testified before the jury that Michael was in prison because of DWIs and a probation revocation. When defense counsel asked Rosalinda to "[t]ell the jury about alcohol in Michael's life," the prosecutor objected to relevance, and the trial court instructed counsel to "rephrase." Counsel then asked Rosalinda if alcohol had "caused criminal problems for Michael in his life," and Rosalinda responded, "Yes." She stated that alcohol had caused Michael to get into trouble, such as, "[j]ail, prison, accidents." Michael had also been convicted of drug offenses.

Although the State objected on relevance grounds when Appellant asked Rosalinda to "[t]ell the jury about alcohol in Michael's life," the trial court instructed Appellant to "rephrase." It is not clear that this instruction was a ruling that sustained the State's

relevance objection. *See* TEX. R. EVID. 611(a) (providing that the trial court should exercise reasonable control over the mode and order of examining witnesses so as to make those procedures effective for determining the truth and avoid needless consumption of time); *cf. Brewer v. State,* 367 S.W.3d 251, 253 (Tex. Crim. App. 2012) (concluding that the trial court's instruction to "move on" was not a ruling). However, even assuming *arguendo* that this instruction did sustain the State's objection, and that the ruling was erroneous, we conclude that any potential error was harmless. *See, e.g., Hernandez,* 390 S.W.3d at 327 (Keller, P.J., concurring) (concluding beyond a reasonable doubt that the trial court's erroneous exclusion of mitigating evidence made no contribution to the jury's answers to the punishment special issues in light of the remaining punishment evidence). After the instruction to "rephrase," defense counsel asked more specific questions and elicited Rosalinda's testimony concerning the "criminal problems" that alcohol had caused for Michael. Further, Michael himself later testified in detail about the problems he had experienced as a result of his alcohol use. Therefore, the jury heard essentially the same information that would have been elicited when counsel asked Rosalinda to "tell the jury about alcohol in Michael's life."

We conclude that the trial court did not abuse its discretion by excluding: Michael's testimony concerning his sexual abuse by his uncle Larry; Delores's testimony concerning her father's physical and verbal abuse of her mother and the sexual abuse of her sister Alma; and Rosalinda's testimony concerning the problems that alcohol had caused for Eric. We are

not persuaded that the trial court's instruction to "rephrase" was a ruling that excluded Rosalinda's testimony concerning the problems that alcohol had caused for Michael. *Cf. Brewer,* 367 S.W.3d at 253. But even if the instruction was such a ruling, we hold that any error was harmless in light of the remaining punishment evidence concerning Michael's alcoholism. Point of error four is overruled.

In point of error five, Appellant asserts that the trial court erred in admitting autopsy evidence that violated the Confrontation Clause of the Sixth Amendment of the United States Constitution. Specifically, Appellant states that the medical examiner who performed the victim's autopsy was not the medical examiner who testified at trial concerning the results of the autopsy. Appellant relies upon *Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 309-10 (2009), and *Bullcoming v. New Mexico,* 564 U.S. 647, 657-62 (2011), for the principle that a testimonial out-of-court statement may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused had a prior opportunity to confront that witness. *See Bullcoming,* 564 U.S. at 657.

The record shows that Dr. Sridhar Natarajan, the Chief Medical Examiner for Lubbock County, testified at trial that Dr. Masahiko Kobayashi, a deputy medical examiner, had performed the victim's autopsy. Defense counsel objected that Natarajan's testimony violated the Confrontation Clause because Natarajan had not performed the autopsy. The trial court overruled the objection.

Natarajan testified that Kobayashi had moved to Hawaii before the trial. Natarajan stated that he "had oversight" over all of Kobayashi's work. Natarajan also testified that he actually reviewed all parts of this case "prior to having the case actually officially signed out as an autopsy report." Specifically, Natarajan oversaw the performance of the autopsy, the analysis, the final conclusions, and the generation of the final report. He examined the autopsy report and signed off on it before it was released.

Natarajan described general autopsy procedures and stated that the goal of an autopsy would be to determine a manner and cause of death. He noted that the manner of death determination is a "medical legal opinion" in which the examiner classifies the death as either natural, accidental, suicide, undetermined, or homicide. He described the cause of death as "an injury/disease process combination," in other words, the reason why an individual actually died. Natarajan stated that, in a typical autopsy, forensic toxicology tests would be performed on the individual's bodily fluids to test whether drugs might have contributed to the death. The medical examiner also would examine the person's organs for damage that might have contributed to the death.

Natarajan testified that, in this case, he had looked at the victim's medical reports. As the individual overseeing Kobayashi's work, Natarajan was aware of all of the victim's internal and external injuries before the autopsy report was finalized. The prosecutor introduced six photographs depicting the injuries on the outside of the victim's body. These

photographs were marked as State's Exhibits 42, 659, 660, 661, 662, and 663. Natarajan testified that he recognized the photographs.

Natarajan stated that he had helped the prosecutor prepare a visual presentation to describe and illustrate the victim's injuries for the jury.[18] He testified that the first image in the presentation contained an "illustration of where an injury is present on the outside of the body," next to two autopsy photographs of that injury.[19] Natarajan testified that, based on his knowledge of the circumstances of this case as well as his knowledge of the internal examination, the injury depicted in the first image was a gunshot wound to the back of the victim's neck. He identified the injury as an entrance gunshot wound, characterized by a "round oval" and "an abrasion bed" or "abrasion band" where the projectile scraped the skin as it entered the body. When the prosecutor asked Natarajan about the projectile's trajectory, defense counsel stated, "I'm going to renew my objection, your Honor, to the -- now the contents of the report based on the bases I stated earlier." The court overruled the objection.

Natarajan then testified that the projectile "enter[ed] along the back of the neck right at the midline," traveling from right to left, as well as from back to front and slightly downward. He stated that most of the damage was "within the bottom of . . . the [sixth]

---

[18] This visual presentation is not in the record before us, so our discussion of it relies upon Natarajan's verbal descriptions as well as our independent review of State's Exhibits 42 and 659 through 663.

[19] State's Exhibits 659 and 660 are two autopsy photographs of that injury. We surmise from Natarajan's description as well as our independent review of the State's exhibits that the image before the jury consisted of State's Exhibits 659 and 660 and an illustration showing the location of the injury.

cervical spine, the seventh cervical spine, and the top of the thoracic spine which would be the first thoracic vertebral bone." The projectile stopped as it struck the first thoracic vertebral bone. Natarajan showed the jury the projectile recovered from that wound, which had been previously admitted as State's Exhibit 647, and described it as "a small caliber deformed projectile."

Natarajan described the next image in the presentation as "an illustration of the front of a male, right arm, chest area," with "a portion of the left arm and shoulder," "to help provide some orientation." An accompanying photograph revealed two gunshot wounds as well as a "significant cut" across the victim's chest.[20] Natarajan explained that the cut was a "thoracotomy," which was performed when the victim entered the hospital, as part of emergency procedures to try to control the bleeding and "continue to have the heart pump."

The location of one gunshot entrance wound was in the middle of the "bony area that you could just feel on yourself that goes both sides." Natarajan testified that a shot fired from an indeterminate distance caused this entrance wound "along the midchest." The projectile's trajectory was right to left, front to back, and slightly downward. The projectile entered the center of the chest, penetrated the sternum, and injured the heart. It struck the right atrium of the heart as well as the superior vena cava, which "is the main drainage that's coming from the region of the head and the upper extremities." Natarajan showed the jury

---

[20] Natarajan's description and our independent review of the State's Exhibits reveal that this photograph was State's Exhibit 661.

the projectile that made this wound. It had been previously admitted as State's Exhibit 645. He described that projectile as being less deformed than the projectile that had lodged in the victim's vertebrae.

Natarajan identified another entrance wound on the upper left chest area, near a tattoo of playing cards and dice. A photograph provided a closer view of that wound.[21] Natarajan testified that the wound's visible characteristics indicated that the firing distance was "not close," but he could not determine a precise firing distance. The trajectory of the projectile that entered the upper left chest area was right to left, front to back, and downward.

Natarajan testified that this projectile perforated portions of the right lung before lodging in "the soft tissues of the body towards the back." Natarajan stated that this projectile also created a hole in the chest that caused the lung to collapse. This damage caused hemorrhaging inside the lung, so that blood filled the chest cavity and left the body. This wound accounted for the significant amount of blood around the victim's body at the crime scene and was consistent with witnesses' testimony describing a considerable amount of blood coming from the victim's nose and mouth. This wound would have interfered with the victim's ability to take in air and, hence, would have resulted in decreased oxygenation of the blood as well as significant blood loss. The projectile that made this wound had previously been admitted as State's Exhibit 646. Natarajan showed this projectile to the jury

---

[21] Natarajan's description and our independent review of the State's Exhibits indicate that this photograph was State's Exhibit 662.

and noted that it was less deformed than the projectile that had lodged in the victim's vertebrae because it had passed through soft tissues.

Natarajan testified that the toxicology test results were negative for drugs, illicit substances, and alcohol. The cause of death was multiple gunshot wounds and the manner of death was homicide.

As an initial matter, we note that the autopsy report was not admitted into evidence. Therefore, the cases upon which Appellant relies, which concern the admission of an unavailable witness's testimonial out-of-court statement, are not directly on point. Rather, the record reflects that Natarajan testified about his own opinions and conclusions based on his review of the autopsy report along with other evidence, including autopsy photographs and x-rays. This testimony was not inadmissible on the basis that it might have been incidentally based, to some degree, on hearsay. *See* TEX. R. EVID. 703 (providing that an expert may base an opinion on facts or data that are not admissible in evidence, provided that they are of a type reasonably relied on by experts in the field); *see also Martinez v. State*, 22 S.W.3d 504, 508 (Tex. Crim. App. 2000) ("Since the trial court implicitly found [a witness] qualified as an expert, the State had no burden to invoke an exception to the hearsay rule."). In addition, several courts have held that photographs are non-testimonial in nature. *See United States v. Sanabria*, 645 F.3d 505, 518 (1st Cir. 2011) (explaining that "surveillance photographs of an individual" were "non-testimonial evidence"); *United States v. Dougall*, 919 F.2d 932, 935 (explaining that photographs "are real and physical evidence, non-

testimonial in nature"); *Herrera v. State,* 367 S.W.3d 762, 773 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (stating that an autopsy photograph is not a testimonial statement); *Wood,* 299 S.W.3d 200, at 214-15 (Tex. App.—Austin 2000, pet. ref'd) (same). Consequently, we are persuaded that Natarajan's descriptions of the autopsy photographs, and their presentation to the jury, did not violate the Confrontation Clause.

Further, Natarajan testified that he oversaw Kobayashi's performance of the autopsy, the analysis, the conclusions, and the generation of the final report, and he examined the report and signed off on it before it was released. Therefore, Natarajan had some personal knowledge of the relevant facts and conclusions that were memorialized in the autopsy report. *See, e.g., Grim v. Fisher,* 816 F.3d 296, 309-10 (5th Cir. 2016) (holding that *Bullcoming* did not clearly establish as federal law that the State could not introduce a forensic lab report containing the testimonial certification of an analyst through the testimony of a technical reviewer who verified the analyst's findings, agreed with a reasonable degree of scientific certainty with the analyst's examinations and results, and signed the certification).[22]

To the extent that Appellant intends to complain about any specific part of Natarajan's testimony, we note that, with one exception, defense counsel did not object to any specific part of that testimony. Therefore, Appellant largely failed to preserve error. Rule 33.1; *see,*

---

[22] In *Bullcoming,* the Supreme Court held that the State could not introduce into evidence a lab report containing a testimonial certification through the in-court testimony of a lab analyst who was familiar with the lab's procedures but "who did not sign the certification or perform or observe the test reported in the certification." *Bullcoming,* 564 U.S. at 657-58.

*e.g., Martinez v. State,* 311 S.W.3d 104, 111-12 (Tex. App.—Amarillo 2010, pet. ref'd) (concluding that an objection to a witness testifying about an autopsy report, while sufficient to preserve error regarding the contents and conclusions contained in the report, did not notify the trial court of any error in the admission of autopsy photographs); *see also, e.g., Roberts v. State,* 220 S.W.3d 521, 532 (Tex. Crim. App. 2007) (stating that the defendant's attack on victim impact testimony in general, advanced before any testimony was heard, did not place the trial court on notice that the defendant would find particular testimony objectionable).

The only instance in which defense counsel objected to a specific part of Natarajan's testimony was after the prosecutor asked Natarajan about the trajectory of the projectile that struck the victim's neck. At that point, defense counsel renewed his general objection to testimony about the contents of the autopsy report. To the extent that Appellant preserved error as to Natarajan's testimony concerning that trajectory, we conclude that any arguable error in admitting that testimony was harmless beyond a reasonable doubt because it did not contribute to the conviction or punishment. *See* TEX. R. APP. P. 44.2(a); *see also*, *e.g., Lee v. State*, 418 S.W.3d 892, 900-01 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (stating that an expert witness's minimal repetition of statements from an autopsy report prepared by another did not materially affect the jury's deliberations); *cf. Martinez,* 311 S.W.3d at 113 (finding no harm where a testifying expert's conclusion regarding the cause of death was cumulative of autopsy photographs and the opinion expressed in the autopsy report).

Finally, because the autopsy report is not in the record, the record on appeal does not contain sufficient information for us to assess whether specific parts of Natarajan's testimony might have violated the Confrontation Clause. *See* TEX. R. APP. P. Rule 33.2 (prescribing bills of exception); *see also Amador v. State,* 221 S.W.3d 666, 675 (Tex. Crim. App. 2007) ("[R]eviewing courts cannot 'assume' or speculate about the contents of exhibits or other materials that are not contained in the appellate record."). We will not speculate as to whether some fraction of Natarajan's testimony might not have been based on his personal knowledge of the case.

The trial court did not abuse its discretion by overruling Appellant's general objection that Dr. Natarajan's testimony violated the Confrontation Clause. Point of error five is overruled.

In point of error six, Appellant asserts that the trial court erred in admitting hearsay evidence and evidence that violated the Confrontation Clause of the United States Constitution. This point of error raises more than one legal theory and is therefore multifarious. *See* Rule TEX. R. APP. P. 38.1; *see also Jenkins,* 493 S.W.3d at 614 n.85. However, we will address it in the interest of justice. Specifically, Appellant complains that the punishment-phase testimony of a police officer who responded to a 2008 domestic violence incident, describing statements the domestic violence victim's mother made to the officer at the scene, was hearsay that was not admissible under the excited utterance exception. Appellant also complains that Child Protective Services ("CPS") records

concerning the same incident, which were admitted as State's Exhibit 712, were hearsay and that their admission violated the Confrontation Clause.

Defense counsel requested that the State proffer, outside the jury's presence, the testimony of Fort Worth Police Officer Leticia Villarreal concerning an extraneous bad act because counsel anticipated making objections to the testimony that he "want[ed] the Court to decide outside the presence of the jury." The trial court granted defense counsel's request. Therefore, outside the jury's presence, Villarreal testified that she responded to a domestic violence call in 2008. According to Villarreal, "The call details had stated that there was a husband and wife arguing outside, and the husband hit his wife." When Villarreal arrived at the scene, she saw the victim and her mother and brother outside, "all talking very loudly." The victim was identified as Megan Suniga. Villarreal attempted to speak with Megan, whose face was "pretty much covered in blood." Her nose was "swollen and bleeding, and her upper lip was very swollen." It appeared to Villarreal that Megan's nose might have been broken. Megan was very argumentative, angry, and uncooperative. She was upset that her family had called the police, and she did not want to identify her assailant. Megan's mother, Leslie Erwin, was also upset and angry. Erwin told Villarreal that Megan had called her, asking to be picked up from the apartment. Erwin stated that Megan's husband, Appellant, had assaulted Megan. Erwin also indicated that Megan was afraid of Appellant. Megan refused to provide Villarreal with details of the incident, complete a written statement, let Villarreal photograph her injuries, or accept a copy of a victims' rights handbook. Villarreal

learned that Megan and Appellant had been in a relationship for about six years and had two children. They were not living together at the time of the assault.

On cross-examination, Villarreal confirmed that she did not witness the assault. She stated that Erwin told her that, when Erwin arrived to pick up Megan, Appellant and Megan were outside. Erwin saw Appellant push Megan twice, and she saw Megan fall to the ground, but Erwin did not witness the initial assault that caused Megan's visible injuries. Defense counsel then objected to Villarreal testifying to anything beyond what she had observed, particularly her testimony concerning Erwin's statements, on the ground that those statements were hearsay. The State responded that any hearsay contained in Villarreal's testimony was admissible under the "excited utterance" exception. The trial court overruled Appellant's objection and granted a running objection.

Before the jury, Officer Villarreal repeated the testimony that she had provided during the proffer. She again acknowledged on cross-examination that she had not witnessed any part of the assault.

"The admissibility of an out-of-court statement under the exceptions to the general hearsay exclusion rule is within the trial court's discretion." *Lawton,* 913 S.W.2d at 553. "An abuse of discretion occurs 'only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree.'" *Id.* (quoting *Cantu v. State,* 842 S.W.2d 667, 682 (Tex. Crim. App. 1992)).

For hearsay to be admissible, it must fit into an exception provided by a statute or the Rules of Evidence. TEX. R. EVID. 802. Rule 803(2) sets forth the excited utterance exception to the general hearsay exclusion rule. *See* TEX. R. EVID. 803(2); *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). "An excited utterance is a statement that relates to a startling event or condition, and it is made when the declarant is still under the stress of excitement caused by the event or condition." *Coble v. State,* 330 S.W.3d 253, 294 (Tex. Crim. App. 2010). "The basis for the excited utterance exception is 'a psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the 'truth will come out.'" *Zuliani,* 97 S.W.3d at 595 (quoting *Evans v. State,* 480 S.W.2d 387, 389 (Tex. Crim. App. 1972)).

In determining whether a hearsay statement is admissible as an excited utterance, the court may consider the time elapsed between the startling event and the statement and whether the statement was a response to a question. *Id.* "However, it is not dispositive that the statement is an answer to a question or that it was separated by a period of time from the startling event; these are simply factors to consider in determining whether the statement is admissible under the excited utterance hearsay exception." *Id.* at 596. "The critical determination is whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event or condition at the time of the statement." *Id.* (internal quotations omitted).

Here, the evidence at the time of the ruling showed that Megan had called her mother, asking to be picked up from her apartment. When Erwin arrived, she saw Appellant push Megan twice, and she saw Megan fall to the ground. Erwin called the police. When Officer Villarreal arrived, Appellant was gone. Megan and Erwin were arguing and "talking real loudly." They were both upset and angry. This record supports the trial court's determination that Erwin was still dominated by the emotions, fear, or pain of the event when she communicated with Villarreal. Thus, the trial court did not abuse its discretion by overruling Appellant's hearsay objection and admitting Erwin's statements to Villarreal as an excited utterance.

The second part of Appellant's complaint concerns the punishment-phase testimony of Heather Darder, a CPS supervisor for Tarrant County, and the admission of CPS records, State's Exhibit 712, regarding a CPS investigation that was connected to the 2008 domestic violence incident.

Darder testified before the jury that the CPS records were kept in the regular course of business by someone who had a duty to make them, and they were made at or near the time of the events recorded. Defense counsel objected "to that portion of State's 712 that contains hearsay matters within these documents that contains the conclusions of other people who are not before the Court testifying," based upon "hearsay for those things, and also under the confrontation clause of the U.S. Constitution." The Court overruled the objection and admitted State's Exhibit 712 into evidence.

Darder testified that her office received an "intake" from law enforcement regarding Appellant because of "concern that a domestic violence dispute was taking place" that involved two children, ages one and three. Law enforcement reported to CPS that Megan had sustained "obvious injuries." A CPS caseworker went to the home "to interview and make sure the children were okay." The caseworker also interviewed Megan. At this point in Darder's testimony, defense counsel requested and received "a running objection to my previous."

Darder then testified that Megan was willing to speak to the caseworker, but she would not explain how she had been injured or who had injured her.[23] It was Megan's mother who told the caseworker that Appellant had injured Megan. Although Megan told the caseworker that she did not know where Appellant lived or how to contact him, Appellant showed up at the apartment during the interview. Contrary to the information that Megan had provided, Appellant informed the caseworker that he lived in the apartment with Megan and their two children. He told the caseworker that he had six children.

Appellant admitted to the caseworker that he had made a living selling methamphetamine. When the caseworker asked him about his drug use, he acknowledged that he had used marijuana and methamphetamine three or four years previously. He

---

[23] On appeal, Appellant asserts for the first time that Darder's testimony that domestic violence victims are not always truthful was inadmissible because it was testimony that a class of persons behaves in a particular way. *See, e.g., Yount v. State,* 872 S.W.2d 706, 711-12 (Tex. Crim. App. 1993). At trial, defense counsel objected that this testimony was "speculation." Appellant's trial objection does not comport with his complaint on appeal, and so he failed to preserve his current complaint. *See* Rule 33.1; *see also Sorto v. State,* 173 S.W.3d 469, 476 (Tex. Crim. App. 2005).

reported that he drank alcohol socially. When questioned about the domestic violence incident, Appellant stated that he and Megan had argued, but he denied touching or pushing her.

The State then asked Darder if Appellant had admitted to going to court for a previous domestic violence charge involving a different victim. Defense counsel objected that this questioning was "beyond the scope of the proffer."[24] Counsel also objected under the Confrontation Clause that this testimony would contain statements of witnesses who were not before the court. The trial court overruled the objection. Darder then testified that Appellant acknowledged that he had gone to court over another domestic violence case involving a different victim.

Darder testified that, as a result of the CPS investigation into the incident involving Megan, CPS implemented a "safety plan." This "plan" was an agreement between the parents and CPS that the parents would cooperate and receive CPS services "through our safety based service unit," and that the parents would "not engage in any type of domestic violence." Based on the totality of the information that CPS received, including Megan's visible injuries, CPS concluded that domestic violence had occurred. On cross-examination, Darder stated that she had been the CPS caseworker's supervisor in this matter, but she acknowledged that she had not been "on the scene."

---

[24] In our independent review, we have not located any place in the record where the State made a proffer of the content of Darder's testimony or the CPS records before calling Darder to testify before the jury.

To preserve error for appellate review, the record must show that Appellant made the complaint to the trial court by a timely request, objection, or motion that stated the grounds for the ruling he sought with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context, and the trial court ruled or refused over objection to rule on the request, objection, or motion. Rule 33.1(a). In the face of a global hearsay objection to an exhibit, the trial court is not required to search through the exhibit and segregate the admissible from the inadmissible. *Ladd,* 3 S.W.3d at 572. Similarly, a general objection to testimony, advanced before any testimony is heard, does not place the trial court on notice that an appellant will find particular unforeseeable testimony to be objectionable. *See Roberts,* 220 S.W.3d at 532.

Darder testified that the CPS records contained in State's Exhibit 712 were kept in the regular course of business by someone who had a duty to make them, and they were made at or near the time of the events recorded. *See* TEX. R. EVID. 803(6). Appellant objected at trial that an unspecified portion of State's Exhibit 712 contained "the conclusions of other people who are not before the Court testifying." Appellant did not locate or identify any specific part of State's Exhibit 712 that was objectionable on that basis. Without more, this objection did not provide the trial court with adequate notice of the particular material

Appellant found objectionable. *See Ladd,* 3 S.W.3d at 572. Thus, the trial court did not err by overruling Appellant's non-specific objection to Exhibit 712.[25]

To the extent that Appellant complains on appeal that Darder's testimony was hearsay and that it violated the Confrontation Clause because she testified about the content of a report prepared by another person, we note that defense counsel's request during her testimony for "a running objection to my previous" did not alert the trial court to this particular complaint. *See Layton v. State,* 280 S.W.3d 235, 239 (Tex. Crim. App. 2009) ("A specific objection is necessary to inform the trial judge of the issue and basis of the objection[.]"). Appellant did not preserve this complaint for appeal. *See* Rule 33.1; *see also Reyna,* 168 S.W.3d at 179 (explaining that an objection on hearsay grounds does not preserve error on Confrontation Clause grounds).[26]

When the prosecutor asked Darder if Appellant had admitted to going to court for a previous domestic violence charge involving a different victim, defense counsel objected under the Confrontation Clause that this testimony would contain statements of witnesses

---

[25] If Appellant intends to complain that allowing Darder rather than the CPS caseworker to testify about the contents of State's Exhibit 712 violated the Confrontation Clause, this complaint does not comport with his objection at trial. *See Jenkins,* 493 S.W.3d at 612. Thus, Appellant failed to preserve this claim. *See Lucio v. State,* 351 S.W.3d 878, 902 (Tex. Crim. App. 2011).

[26] Moreover, to the extent that Appellant may now be understood to challenge not just the admission of State's Exhibit 712, or Darder's testimony as she may have gleaned it from that exhibit, but also the admission of Darder's testimony in which she related what Appellant may have told the CPS caseworker that the CPS caseworker *may then have orally related to Darder*, no objection to Darder's testimony as hearsay within hearsay was ever leveled at trial. No such objection was made or ruled upon at the trial court level, and therefore, no such error was preserved. Rule 33.1.

who were not before the court. The trial court overruled the objection. Darder then testified that Appellant acknowledged that he had gone to court over another domestic violence case involving a different victim. The prosecutor's questioning then returned to the incident involving Megan.

This part of Appellant's complaint concerns a statement that Appellant, personally, made to the CPS caseworker concerning a different domestic violence case. Assuming *arguendo* that the admission of that statement was erroneous, its admission was harmless because a copy of the judgment of conviction for that prior incident had already been admitted into evidence without objection as State's Exhibit 709, and a portion of it had been read into the record. *See Leday v. State,* 983 S.W.2d 713, 717 (Tex. Crim. App. 1998) (stating that the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence that was not challenged). As read into the record, the judgment recited that Appellant was "guilty of assault bodily injury of a family member, committed on October 12, of 2000, a Class A misdemeanor where the Defendant intentionally or knowingly caused bodily injury to Christy Bretts, a member of the Defendant's family or household[,] by hitting her with his hand."

In sum, the trial court did not abuse its discretion by ruling that Erwin's statements to Villarreal were admissible as an excited utterance, or by admitting State's Exhibit 712 over Appellant's objection that an unspecified part of it contained the conclusions of people who were not before the Court testifying. Further, any arguable error in admitting Appellant's

statement concerning a previous domestic violence case was harmless. Point of error six is overruled.

In point of error seven, Appellant asserts that the trial court erred in denying a Fourth Amendment motion to suppress evidence based on the search of the vehicle in which he was riding at the time of his arrest. Specifically, Appellant complains that police searched the vehicle without a valid warrant and that no exception to the warrant requirement applied.

The record shows that Appellant filed a pre-trial motion to suppress evidence seized following the execution of a search warrant on December 28, 2011, in Taylor County. In his motion, Appellant asserted that the warrant provided only for the seizure of the vehicle and not for a search of its contents. Therefore, he argued, the evidence obtained during the vehicle search had to be suppressed because it was not seized pursuant to a valid search warrant.

At the pre-trial hearing on this motion, defense counsel argued that Appellant was a passenger in a vehicle that law enforcement stopped when there was no warrant for his or his co-defendant's arrest. He asserted that, after the arrest, a Taylor County magistrate signed a search warrant which provided only for seizing the vehicle; it did not authorize a search of the vehicle's contents. Defense counsel argued that Appellant, as a passenger in the vehicle, had standing to challenge the vehicle search under *Brendlin v. California,* 551 U.S. 249, 263 (2007), which states that both the driver and the passenger are seized within the meaning of

the Fourth Amendment when a police officer makes a traffic stop. Counsel clarified that he was not challenging the constitutionality of the stop.

Defense counsel asserted that the police officer who prepared the affidavit for the search warrant had requested authority to transport, remove, or take any property or evidence seized pursuant to the warrant to any location deemed necessary for the purpose of safekeeping and completion of the investigation. Thus, counsel argued, once the vehicle was in police safekeeping, no warrant provided authority to search the vehicle and no exception to the warrant requirement existed. According to counsel, when Lubbock police officers searched the vehicle without obtaining a search warrant, that search was illegal.

The prosecutor argued that Appellant did not have standing to challenge the search because *Brendlin* enabled a passenger to challenge only a vehicle stop, not a vehicle search. As the passenger, Appellant had no reasonable expectation of privacy in the vehicle. The prosecutor also asserted that some of the items seized from the vehicle were recovered during a search incident to arrest while the vehicle was stopped on the side of the road and a narcotics dog had alerted to the presence of drugs, and so the automobile exception also applied to the roadside search. The prosecutor further cited *United States v. Johns,* 469 U.S. 478, 484 (1985), for the principle that there is no requirement that a warrantless vehicle search occur contemporaneously with the vehicle's lawful seizure if there is probable cause to believe that the vehicle contains contraband.

Concerning the search that officers conducted after transporting the vehicle to the Lubbock Police Department, the prosecutor argued that the vehicle exception applied to authorize the search even if the search warrant did not. The prosecutor argued that, under *Adkins v. State,* 764 S.W.2d 782, 784 (Tex. Crim. App. 1988), when a warrant is found invalid, the search should be treated as if it proceeded without a warrant, such that the trial court should consider whether the search can be upheld under an exception to the warrant requirement.

The trial court found that Appellant did not have standing to challenge the searches. Alternatively, the court denied the motion to suppress because the searches were lawful. The court granted defense counsel's request for a running objection to any testimony concerning "anything that was taken at any time from the vehicle."

On June 3, 2015,[27] the trial court entered written findings of fact and conclusions of law regarding the motion to suppress. The court found that a Taylor County Sheriff's Deputy stopped the vehicle after receiving a bulletin to be on the lookout for "a tan or champagne colored SUV with two male subjects that were wanted for a murder that had taken place in Lubbock County." The bulletin advised that one of the men had tattoos on his head. Shortly thereafter, the deputy saw a vehicle matching that description and initiated a traffic stop. During the stop, he saw that the passenger had tattoos on his head. He determined that the

---

[27] June 15, 2015, is the file-stamped date, but June 3rd is the date the judge signed and entered the findings and conclusions. These findings and conclusions were entered following this Court's May 20, 2015, order abating the appeal and directing the trial court to supplement the record.

driver was Lopez and the passenger was Appellant. They were both arrested "based on outstanding homicide warrants."

The court also found that a narcotics dog "was run around the vehicle" and alerted to the presence of drugs in the vehicle. At that time, the deputy conducted a roadside search and found items that were later turned over to Lubbock Police Department detectives. The vehicle was taken to a police holding facility in Abilene and then released to Lubbock detectives after a Taylor County magistrate signed a search warrant that authorized law enforcement to seize the vehicle. The vehicle, which belonged to Lopez's mother, was searched at the Lubbock Police Department's processing facility. During that search, additional items of evidence were recovered.

The trial court concluded that Appellant lacked standing to challenge the vehicle searches because he failed to prove that he had a reasonable expectation of privacy in the vehicle or its contents. Alternatively, even if the warrant did not authorize the second search, the searches were proper under the automobile exception because law enforcement had probable cause to believe the vehicle contained evidence of a crime, and there was no requirement that the search be contemporaneous with the vehicle's seizure.

When a trial judge enters findings of fact after denying a motion to suppress, an appellate court reviewing that denial must first determine whether the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *Keehn v. State,* 279 S.W.3d 330, 334 (Tex. Crim. App. 2009). The appellate court reviews de novo the trial

court's resolution of purely legal questions. *Gonzales v. State,* 369 S.W.3d 851, 854 (Tex. Crim. App. 2012).

In this case, the circumstances of the vehicle searches were largely undisputed. Further, the trial court's determination that Appellant did not have standing to challenge the vehicle search was a purely legal question. Thus, we review that determination de novo. *See, e.g., Matthews v. State,* 431 S.W.3d 596, 607 (Tex. Crim. App. 2014) ("Although we defer to the trial judge's factual findings, we review the legal issue of standing de novo.").

The rights protected by the Fourth Amendment to the United States Constitution are personal. *Id.* at 606 (citing *Rakas v. Illinois,* 439 U.S. 128, 133-34 (1978)). As such, an accused must show that the challenged search violated his own, rather than a third party's, legitimate expectation of privacy in the place invaded. *State v. Betts,* 397 S.W.3d 198, 203 (Tex. Crim. App. 2013). A defendant alleging an unconstitutional search has the burden of proving facts demonstrating that he, personally, exhibited an actual subjective expectation of privacy in the place invaded, and that his expectation of privacy is one that society is prepared to recognize as objectively reasonable. *Id.; see also Minnesota v. Carter,* 525 U.S. 83, 87-88 (1998). The United States Supreme Court has held that automobile passengers cannot assert the protection of the Fourth Amendment against the seizure of incriminating

evidence from a vehicle where they owned neither the vehicle nor the evidence. *Rakas,* 439

U.S. at 139-40.[28]

As the passenger in a vehicle that he did not own, Appellant had standing to challenge

the constitutionality of the traffic stop, *see Brendlin,* 551 U.S. at 251, but he did not have

standing to challenge the constitutionality of the vehicle searches that followed, *see Rakas,*

439 U.S. at 139-40. Whatever subjective expectation of privacy Appellant may have had in

the vehicle, it was not one that society is prepared to recognize as objectively reasonable.

Because Appellant did not have standing to challenge the vehicle searches, we need not

address the trial court's alternative determination, that the searches were lawful under the

automobile exception. Point of error seven is overruled.

## JURY INSTRUCTIONS

In point of error eight, Appellant asserts that the trial court erred by denying his

proposed jury charge concerning the consideration of eyewitness testimony, in violation of

the Due Process Clause of the United States Constitution. Appellant's proposed jury charge,

---

[28] On appeal, Appellant asserts for the first time that he has standing because his personal property was in the vehicle and the evidence recovered during the searches was "plainly in proximity to him." He relies on a footnote from this Court's opinion in *Goodwin v. State,* 799 S.W.2d 719, 725 n.2 (Tex. Crim. App. 1990), where we indicated that a passenger-defendant's motion to suppress, which made a specific claim to ownership of "certain luggage" that was seized from the vehicle during the search, established standing to challenge the search. However, that footnote was dicta because we presumed for other reasons that the defendant had standing. *Id.* at 725. In any event, Appellant made no claim of ownership during proceedings before the trial court. We will not consider this argument for the first time on appeal. Rule 33.1; *see also Dragoo v. State,* 96 S.W.3d 308, 313 (Tex. Crim. App. 2003) ("As a general rule, an appellate court reviewing a trial court's ruling on the admission or exclusion of evidence must do so in light of the arguments, information, and evidence that was available to the trial court at the time it ruled.").

which comprised approximately four double-spaced pages, would have instructed the jury

that: the State carried the burden of proving identity beyond a reasonable doubt; the State's

six eyewitnesses did not identify Appellant in court as the perpetrator of the offense; and, the

jurors had to determine whether the eyewitnesses' identifications of the defendant were

reliable and believable.[29]

The proposed charge also discussed research showing that human memory is not

foolproof and outlined circumstances that might affect the reliability of eyewitness

identification testimony.[30] The charge instructed jurors to consider a witness's opportunity

---

[29] Specifically, the relevant portion of the proposed charge stated:

The State has presented the testimony of six witnesses who described Defendant. You will recall that these witnesses did not identify the defendant in court as the person who committed this offense. According to the witnesses, their identification of the defendant was based upon the observations and perceptions that they made of the perpetrator at the time the offense was being committed. It is your function to determine whether the witnesses' identification of the defendant is reliable and believable, or whether it is based on a mistake or for any reason is not worthy of belief. You must decide whether it is evidence beyond a reasonable doubt that this defendant is the person who committed the offense charged.

[30] Specifically, this section of the charge stated:

Eyewitness identification evidence must be scrutinized carefully. Human beings have the ability to recognize other people from past experiences and to identify them at a later time, but research has shown that there are risks of making mistaken identifications. That research has focused on the nature of memory and the factors that affect the reliability of eyewitness identifications.

Human memory is not foolproof. Research has revealed that human memory is not like a video recording that a witness need only replay to remember what happened. Memory is far more complex. The process of remembering consists of three stages . . . At each of these stages, memory can be affected by a variety of factors.

to view the perpetrator and a witness's degree of attention to the perpetrator at the time of the offense, including factors such as a witness's stress level, the duration of viewing time, and the distance between a witness and the perpetrator, as well as "any other factor" that the jurors considered relevant to determining whether a witness's identification was reliable. The charge concluded by instructing the jurors that they had to find Appellant not guilty if they determined that the State had not proven beyond a reasonable doubt that Appellant was the person who committed the offense, and that they had to further consider whether the State had proven "each and every element of the offense charged beyond a reasonable doubt" if they determined that the State had proven that Appellant was "correctly identified."

The jury is the exclusive judge of the facts proved and of the weight to be given to the testimony. *Bartlett v. State,* 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). The trial court must give the jury a written charge "setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." Article 36.14; *see also Celis v. State,* 416 S.W.3d 419, 433 (Tex. Crim. App. 2013) (plurality op.). "The jury are bound to take the law from the court, and when the charge is made to embrace the rules of law and philosophic dissertations upon the nature of evidence, the jury are not always capable of distinguishing the one from the other." *Bartlett,* 270 S.W.3d at 150 n.6 (quoting *Brown v. The State,* 23 Tex. 195, 201-02 (1859)). Therefore, a charge that extends beyond a plain statement of the law of the case

may invade the province of the jury. *Id.* Accordingly, "Texas courts are forbidden from instructing the jury on any presumption or evidentiary sufficiency rule that does not have a statutory basis." *Brown v. State,* 122 S.W.3d 794, 799 (Tex. Crim. App. 2003).

There are three specific circumstances under which a trial court may single out a particular item of evidence in the jury instruction without signaling to the jury an impermissible view of the weight (or lack thereof) of that evidence. *Bartlett,* 270 S.W.3d at 151; *see also* Art. 38.04. First, the trial court may specifically instruct the jury when the law directs the jury to attach a certain degree of weight, or only a particular or limited significance, to a specific category or item of evidence. *Bartlett,* 270 S.W.3d at 151. Second, the Legislature has expressly required the trial court to call particular attention to specific evidence in the jury charge when the law specifically identifies it as a predicate fact from which a jury may presume the existence of an ultimate or elemental fact. *Id.* Third, the trial court may instruct the jury with respect to evidence that is admissible contingent upon certain predicate facts that the jury must decide. *Id.*

Outside of these statutorily recognized exceptions, a trial court should avoid any allusion in the jury charge to a particular fact in evidence, as the jury might construe this as a judicial endorsement or imprimatur. *Id.* at 150. Similarly, the trial court should not give an instruction that "singles out a specific type of evidence" and invites the jury to pay particular attention to it. *See Brown,* 122 S.W.3d at 800. Such a charge risks impinging upon the independence of the jury in its role as the trier of fact. *Bartlett,* 270 S.W.3d at 151-

52; *see also Kirsch v. State,* 357 S.W.3d 645, 652 (Tex. Crim. App. 2012) ("An instruction, albeit facially neutral and legally accurate, may nevertheless constitute an improper comment on the weight of the evidence.").

In this case, the six eyewitnesses who testified that they were present during the offense did not identify Appellant at trial as the perpetrator. Therefore, Appellant's proposed eyewitness identification jury instruction was not relevant. *See Brown,* 122 S.W.3d at 801 ("On this near end of the 'improper-judicial comment' spectrum is an instruction that is simply unnecessary and fails to clarify the law for the jury."). Also, the instruction was effectively a comment on the weight of the eyewitnesses' testimony. In addition, the language of the proposed instruction was internally inconsistent; the instruction stated that the eyewitnesses had not identified Appellant, but then instructed the jury to assess the reliability and believability of the eyewitnesses' identifications of Appellant. Further, the charge described the results of unspecified "research," which was not in evidence, concerning the fallibility of human memory and the risks of mistaken eyewitness identification. *See id.* at 797 (stating that the advocates, rather than the judge, have the task of producing the evidence, arguing its significance, and pointing out the logical inferences that flow from it). In any event, Appellant's proposed jury instruction fell outside of the statutorily recognized exceptions for jury charges that single out particular evidence or types of evidence. *See Bartlett,* 270 S.W.3d at 150. Thus, the trial court properly refused to provide it.

Appellant points to a "growing awareness" that eyewitness testimony may be unreliable. *See, e.g., Tillman v. State,* 345 S.W.3d 425, 436 (Tex. Crim. App. 2011). He also notes the United States Supreme Court's observation that eyewitness-specific jury instructions are one type of safeguard against jurors' placing undue weight on eyewitness testimony of questionable reliability. *See Perry v. New Hampshire,* 565 U.S. 228, 245-47 (2012). However, neither *Tillman* nor *Perry* requires a trial court to instruct a jury on the reliability of eyewitness identifications. Further, *Perry* does not suggest that due process requires such an instruction. Because Appellant's proposed jury instruction was not relevant to the facts of the case, and because it fell outside of the recognized exceptions for jury charges that single out particular evidence or types of evidence, the trial court did not err by refusing to provide it. Point of error eight is overruled.

## JURY VOIR DIRE

In point of error nine, Appellant asserts that the trial court erred in denying his challenges for cause to ten unqualified venire members, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Specifically, Appellant identifies Monica Castillo, Mark Hayden, Cynthia Hill, Robert Jetter, Jason Hicks, Mason West, Kasey Hampton, Mirabeau Lamar, Richard Timmons, and Randy Hanfeld, as unqualified venire members against whom he was forced to exercise peremptory strikes.

When the trial judge denies a defendant's valid challenge for cause, forcing him to use a peremptory strike on a venire member who should have been removed, the defendant is

harmed if he would have used that peremptory strike on another objectionable juror. *Comeaux v. State,* 445 S.W.3d 745, 750 (Tex. Crim. App. 2014). To establish harm arising from the trial court's erroneous denial of his challenge for cause, the defendant must show on the record that: (1) he asserted a clear and specific challenge for cause; (2) he used a peremptory strike on the complained-of venire member; (3) his peremptory strikes were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury. *Daniel v. State,* 485 S.W.3d 24, 33 (Tex. Crim. App. 2016).

Article 35.15(a) provides that, in capital cases in which the State seeks the death penalty, the defendant is entitled to fifteen peremptory strikes. *Id.* at 34 n.4. In this case, Appellant exhausted his fifteen peremptory strikes and received two additional strikes. After he exhausted those strikes, Appellant challenged Hanfeld for cause, asserting that Hanfeld was mitigation-impaired and therefore biased against the law upon which Appellant was entitled to rely. The trial court denied this challenge. Appellant then requested an additional strike to use against Hanfeld, which the trial court denied. Appellant next identified Hanfeld as an objectionable juror who would not have sat on the jury, but for the denial of an additional strike.[31] Because Appellant received two additional peremptory strikes, he was harmed only if the record reflects that the trial court erroneously denied his challenges for

---

[31] Appellant points out that he also identified White as an objectionable juror after the trial court's inquiry discussed in point of error two, above. Given the timing of the alleged error concerning White, and our disposition of point of error two, this fact does not affect our analysis of this point of error.

cause to at least three venire members, so that he was forced to use peremptory strikes against them. *See Buntion,* 482 S.W.3d at 83.

On appeal, we review a trial court's ruling on a challenge for cause with considerable deference because the trial court is in the best position to evaluate the venire member's demeanor and responses. *Newbury,* 135 S.W.3d at 32. We will reverse a trial court's ruling on a challenge for cause "only if a clear abuse of discretion is evident." *Colburn,* 966 S.W.2d at 517.

### *Hayden*

Appellant challenged Hayden on the grounds that: he was friends with the prosecutor; he was mitigation-impaired as a result of the State's use of an improper hypothetical; his girlfriend worked for TDCJ and he was concerned for her safety; he improperly shifted the burden to Appellant to disprove the future dangerousness special issue; he would favor the credibility of police officers as witnesses; and he misunderstood the term "probability" as used in the future dangerousness special issue.[32]

Article 35.16(c)(1) provides that the defense may challenge for cause a venire member who is "related within the third degree of consanguinity or affinity, as determined under Chapter 573, Government Code, to the person injured by the commission of the offense, or to any prosecutor in the case." Without more, a venire member's friendship or acquaintance

---

[32] We will not address other grounds for challenging Hayden that Appellant arguably raised during voir dire but does not raise on appeal.

with the prosecutor does not disqualify him. In this case, Hayden expressly and repeatedly stated that his acquaintance with the prosecutor would not affect his ability to make a decision solely on the evidence presented and to find the defendant not guilty if the evidence did not persuade him of the defendant's guilt beyond a reasonable doubt. Thus, the trial court did not abuse its discretion in denying Appellant's challenge for cause on this basis.

The use of a hypothetical fact situation during voir dire is permissible if the hypothetical scenario is used to explain the application of the law. *Atkins v. State,* 951 S.W.2d 787, 789 (Tex. Crim. App. 1997). However, it is improper to inquire how a venire member would respond to particular circumstances as presented in a hypothetical question. *Id.* at 789-90. A party may use a hypothetical to ascertain venire members' views on issues pertinent to a fair determination of the case, but not to commit them to a particular set of facts or circumstances. *Id.*

In this case, while questioning Hayden about the anti-parties special issue,[33] the prosecutor presented a hypothetical scenario in which two people planned a restaurant robbery, armed themselves, committed the robbery, and then, as they were leaving the scene of the robbery, one of them shot and killed a customer who ran after them. The prosecutor asked Hayden who would be guilty of capital murder in that scenario, and Hayden identified

---

[33] Article 37.071, section 2(b)(2), provides that, at the punishment stage of a case in which the jury was permitted at the guilt or innocence stage to find the defendant guilty as a party, the trial court is required to submit to the jury the issue of "whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." *See Ladd,* 3 S.W.3d at 573.

both the gunman and the accomplice. Defense counsel objected that the prosecutor's hypothetical scenario was too similar to the facts of this case, and the trial court sustained the objection. Defense counsel did not seek further relief.

The prosecutor then continued questioning Hayden about the anti-parties special issue, but without referring to the hypothetical scenario. The prosecutor explained that the anti-parties question was easy to answer if a defendant actually took someone's life, but was harder to answer "when you're dealing with somebody that may not be actually responsible." The prosecutor stated that the jury would have to rely on the evidence and that the prosecutor would have to prove the anti-parties special issue beyond a reasonable doubt before jurors could answer the question affirmatively. Hayden confirmed his understanding that the punishment would be a life sentence if the prosecutor did not prove the anti-parties issue.

Later, defense counsel referred back to the prosecutor's hypothetical scenario, and Hayden agreed with counsel that the evidence might not show that the gunman's accomplice anticipated that a life would be taken. Hayden affirmed that, in answering the special issues, he would require the State to prove to him that the defendant anticipated that a human life would be taken.

This record indicates that, although the prosecutor used a hypothetical scenario that closely resembled the facts of this case, he did not commit Hayden to a particular set of facts or circumstances. After the prosecutor presented the hypothetical scenario and Hayden expressed his understanding that both accomplices would be guilty of capital murder, the trial

court sustained defense counsel's objection, and the prosecutor made no further reference to the hypothetical. Thus, the prosecutor never actually questioned Hayden about his response to those particular circumstances in the context of the anti-parties special issue. Therefore, the prosecutor did not commit Hayden to the specific facts of the case. Further, defense counsel referred to the prosecutor's hypothetical scenario to emphasize the point that the evidence might not prove the anti-parties issue, and Hayden agreed that he would have to rely on the evidence and require the State to prove the issue. Appellant has not shown a valid ground for a challenge for cause. *See* Art. 35.16. The trial court did not abuse its discretion by denying Appellant's challenge for cause on this basis.

Further, the fact that Hayden's girlfriend worked for TDCJ in a prison unit was not a valid basis for a challenge for cause. *See Saldano v. State,* 232 S.W.3d 77, 93-94 (Tex. Crim. App. 2007) (concluding that the trial court properly denied a challenge for cause to a prospective juror whose father was a police officer, when the juror stated that this fact would not prevent him from following the law as it had been explained to him during voir dire). Hayden acknowledged that his girlfriend had told him about some scary situations that she had faced while working in prison, but he stated that her job would not affect his decision in this case. The trial court did not abuse its discretion by denying a challenge for cause on this basis.

We next turn to Appellant's argument that Hayden improperly shifted the burden to Appellant to disprove future dangerousness. Article 37.071, section 2(c), requires the State

to prove the future dangerousness special issue beyond a reasonable doubt. *Ladd,* 3 S.W.3d at 558. Therefore, any venire member who would automatically answer this special issue in the affirmative, or who would place the burden of proof on the defense, is challengeable for cause under Article 35.16(c)(2) as having a bias or prejudice against a law applicable to the case upon which the defense is entitled to rely. *Davis,* 329 S.W.3d at 808. However, the trial court does not abuse its discretion in denying a challenge for cause to a venire member who states that he would be "inclined" to answer the special issues in such a way that the death penalty would be assessed after finding a defendant guilty of capital murder, but who also states that he would follow the law, hold the State to its burden of proof on the special issues, and answer the special issues based solely on the evidence. *Ladd,* 3 S.W.3d at 559-59, 561; *see also, e.g., Saldano,* 232 S.W.3d at 94-96 (finding no abuse of discretion when trial court denied challenges for cause to two venire members who acknowledged that they would have a predisposition or "leaning" toward answering the future dangerousness issue affirmatively after convicting a defendant of capital murder, but who also stated that they could set aside their biases and make the State prove future dangerousness beyond a reasonable doubt).

The record reflects that Hayden expressed his understanding and agreement when the prosecutor explained that the State had to prove the future dangerousness special issue beyond a reasonable doubt. Similarly, Hayden told defense counsel that he would require the State to present evidence showing that a defendant would be a continuing threat. However, when counsel asked Hayden about his personal views, Hayden admitted that, after

finding someone guilty of capital murder, he would view that person "in [his] mind" or "gut" as a continuing threat, and he would want the defendant to "bring something" to show that he would not be a continuing threat. The prosecutor then elicited Hayden's confirmation that he understood that the law envisioned times when a person convicted of capital murder would not be a continuing threat.

When a venire member's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial court's decision. *Hernandez,* 390 S.W.3d at 317. In this case, defense counsel inquired into Hayden's personal views, and Hayden acknowledged that his views were inconsistent with the law. However, defense counsel did not inquire into Hayden's ability to set aside his personal views and follow the law, and Hayden never expressed an inability to do so. We defer to the decision of the trial judge, who was in the best position to ascertain whether Hayden's opinions would interfere with his ability to serve as a juror. *See Davis,* 329 S.W.3d at 807 ("We review a trial court's ruling on a challenge for cause with considerable deference because the trial judge is in the best position to evaluate a venire member's demeanor and responses."); *see also Gardner v. State,* 306 S.W.3d 274, 297 (Tex. Crim. App. 2009) (noting that, when a venire member's answers during voir dire contain ambiguities and contradictions, we give great deference to the trial judge's assessment of the venire member's meaning based on demeanor, tone, and the totality of the questioning). The trial court did not abuse its discretion by denying a challenge for cause on this basis.

The trial court also did not abuse its discretion by denying the challenge for cause based on Hayden's statements about witness credibility. A venire member is challengeable for cause under Article 35.16(a)(9) if he cannot impartially judge the credibility of witnesses. *Feldman,* 71 S.W.3d at 745. However, this means only that jurors must be open-minded and persuadable, with no extreme or absolute positions regarding the credibility of any witness. *See Jones,* 982 S.W.2d at 389. A venire member is not challengeable for cause simply because he would give certain classes of witnesses a slight edge in terms of credibility, because "complete impartiality cannot be realized as long as human beings are called upon to be jurors." *Id.* at 390. Thus, a juror is not challengeable simply because he would tend to believe police officers and doctors slightly more than other witnesses. *Ladd,* 3 S.W.3d at 560 (citing *Smith v. State,* 907 S.W.2d 522, 531 (Tex. Crim. App. 1995)).

In this case, Hayden stated that he would decide whether to believe a witness based on the witness's testimony. He affirmed that he could apply his "own common sense" to the evidence and decide whether a witness was credible. He stated that he could apply the same standard to assess the credibility of a police officer witness and the credibility of a testifying defendant. However, Hayden also admitted he might "lean a little bit toward a police officer versus a Defendant," and that he generally holds police officers to a higher moral standard than other people. The prosecutor then elicited Hayden's affirmation that he would treat all witnesses the same before they testified. The trial court did not abuse its discretion by

denying Appellant's challenge for cause on this ground. *See Ladd,* 3 S.W.3d at 560; *Jones,* 982 S.W.2d at 389-90.

Finally, we turn to Appellant's argument regarding Hayden's understanding of the term "probability." We have held that the term "probability" as used in the future dangerousness special issue need not be defined, but we have also held that the term means more than a "mere possibility" or "bare chance" of future violence. *See Murphy v. State,* 112 S.W.3d 592, 600 (Tex. Crim. App. 2003); *Smith v. State,* 779 S.W.2d 417, 421 (Tex. Crim. App. 1989). If a venire member's understanding or definition of the term "probability" is inconsistent with this distinction, then "it must be explained to the venire member that the law requires him to see and accept" this distinction. *Murphy,* 112 S.W.3d at 600; *see also Feldman,* 71 S.W.3d at 744. After the law has been explained, if the venire member continues to insist upon a definition or understanding of the term "probability" that is inconsistent with this distinction, then he may be challengeable for cause. *Murphy,* 112 S.W.3d at 600. On the other hand, if the law was not carefully or adequately explained to the venire member, then the trial court does not abuse its discretion by denying a challenge for cause. *See id.*

When the prosecutor asked Hayden how he would define the term "probability," Hayden responded, "The chance of something happening." The prosecutor then stated that probability was "more than a possibility but less than a certainty, but there's no definition, it's up to" each juror. Defense counsel also stated that the term "probability" was undefined

and that jurors could have their own definitions. Defense counsel did not explain the law to Hayden and inquire into his ability to follow it. Thus, the trial court did not abuse its discretion by denying Appellant's challenge for cause to Hayden on this basis.

*Hill*

Appellant challenged Hill on the grounds that she improperly shifted the burden to the defendant to disprove his guilt and future dangerousness, and that she would require the defendant to present evidence.

The record reflects that, in responding to a general question about her ability to be fair, Hill initially indicated that she would consider "different sides" to the story. However, she also stated that the presumption of innocence, which placed the burden of proof on the State, was fair. When the prosecutor explained that the State had to prove a defendant's guilt and future dangerousness beyond a reasonable doubt, Hill did not express any difficulty in understanding and applying that requirement. Similarly, when questioned by defense counsel, Hill indicated that she understood that the State had the burden to prove a defendant's guilt and the future dangerousness special issue beyond a reasonable doubt. She reiterated that "each side has a story to tell," and she opined that defense counsel would be a poor advocate if he did nothing on the defendant's behalf. However, she also stated that she would not hold defense counsel's failings against the defendant and that, if the defense did nothing, it would not affect her verdict.

Defense counsel continued this line of inquiry:

Q. Okay. Do you think -- do you believe there's any burden on us to prove that the State's wrong?

A. According to everything I've heard you have no burden to produce anything.

Q. Do you think that's fair?

A. I think that's fair. That's the way the law is written.

Q. Okay. One of your roles as a juror is obviously you have to hear all the evidence, but what -- after you hear the evidence, what do you have to do with it?

A. You have to -- you have to go through it and decide whether it's -- whether it meets the requirements of the case.

Q. Okay. You have to process all that stuff, don't you?

A. Yes, sir.

Q. Okay. And where do you think 99.9 percent of that evidence is going to come from?

A. The State.

This record does not support Appellant's assertions that Hill would improperly shift the burden to the defendant to disprove his guilt and future dangerousness, or that Hill would require the defendant to present evidence. To the extent that Hill's answers were vacillating or unclear, we defer to the trial court's decision. *See Hernandez,* 390 S.W.3d at 317. The trial court did not abuse its discretion by denying Appellant's challenge for cause to Hill.

*Jetter*

Appellant challenged Jetter on grounds that he: (1) was "an automatic yes" on the future dangerousness issue, in that the defendant "would always be a future danger,"[34] and therefore was biased against a law upon which Appellant was entitled to rely; (2) improperly shifted the burden of proof to the defendant; and (3) favored the credibility of police officers as witnesses.

When questioned by the prosecution, Jetter indicated that he understood that the State had the burden to prove the future dangerousness issue beyond a reasonable doubt. When questioned by the defense, Jetter indicated that, after finding a defendant guilty, he would not automatically think that the death penalty was the appropriate punishment. Jetter did not state that, after finding a defendant guilty of capital murder, he would always answer the future dangerousness issue affirmatively. Further, neither party asked Jetter whether he would be able to answer the future dangerousness question negatively. *See Feldman,* 71 S.W.3d at 744 (explaining that, before a prospective juror may be excused for cause on the basis of bias or prejudice, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views). As the proponent of the challenge for cause, Appellant had to show that Jetter understood the requirements of the law and could not overcome his prejudice well enough to follow it. *See Davis,* 329 S.W.3d at 807.

---

[34] On appeal, Appellant focuses on Jetter's broad understanding of the phrase, "criminal acts of violence." We will not consider this argument because defense counsel's challenge for cause during voir dire did not give the trial court notice of this particular complaint. *See* Rule 33.1; *see also Layton,* 280 S.W.3d at 239.

Appellant did not make this showing. Thus, the trial court did not abuse its discretion by denying Appellant's challenge for cause on this ground.

When the prosecutor explained the State's burden of proof, Jetter indicated that he understood and would hold the State to its burden of proving the defendant's guilt and future dangerousness beyond a reasonable doubt. Jetter stated that placing the burden of proof on the State was fair and that the State should have that responsibility. When defense counsel asked Jetter what the role of the defense should be, Jetter stated that he felt that the defense was "there to argue what has been shown by the other side and prove that the other side was wrong." Defense counsel asked Jetter if he expected the defense to bring him evidence, and he responded, "I feel that the State has the burden of proof, but then the Defense has a burden to prove that some of what -- some or all of what was said by the State is incorrect." However, Jetter also stated that he would not hold it against the defendant if the State presented fifteen witnesses and the defendant did not present any. He added, "even though the Defense hasn't proven anything or sent anybody to disprove the other side does not mean that he's not correct. Does that make any sense?" Jetter then affirmed that he could find the defendant not guilty even if the defense presented no witnesses; he could rely solely on the State's evidence to find the defendant not guilty.

As the proponent of the challenge for cause, Appellant had to show that Jetter understood the requirements of the law and could not overcome his prejudice well enough to follow it. *See Davis,* 329 S.W.3d at 807. Appellant's questions concerning Jetter's views

about the role of the defense did not accomplish this. *Cf. Ladd,* 3 S.W.3d at 561 (finding no abuse of discretion in denying challenge for cause to venire member who stated that he would expect the defendant to present evidence of his innocence but who also stated that he would follow the law and hold the State to its burden of proof). Further, to the extent that Jetter's answers were unclear or vacillating, we defer to the trial court's decision. *See Hernandez,* 390 S.W.3d at 317. The trial court did not abuse its discretion by denying Appellant's challenge on this basis.

Jetter stated that he would not automatically believe that a police officer witness would tell the truth. When defense counsel asked Jetter where he would "put" a "police officer on the credibility scale" when the officer took the stand, Jetter responded, "Higher than midway, but at the same time a police officer is just a regular person like everyone else." Jetter stated that he had known police officers to lie. When asked where he would place a testifying defendant on the credibility scale, Jetter responded that he would "start out" a testifying defendant "midway," in that the defendant "doesn't have anything against him or anything for him at the beginning." Jetter's responses indicated that, although he might give a "slight edge" to police officer witnesses, he was open-minded and persuadable, with no extreme or absolute positions regarding the credibility of any witness. *See Jones,* 982 S.W.2d at 389-90. The trial court did not abuse its discretion by denying Appellant's challenge for cause to Jetter.

*Hicks*

Appellant challenged Hicks on the ground that he defined the phrase, "criminal acts of violence," as used in the future dangerousness issue, too broadly, based on "his belief that any violation of the law or rule is a criminal act of violence."

The Legislature has not defined the phrase "criminal act of violence." *Jones v. State,* 119 S.W.3d 766, 788 (Tex. Crim. App. 2003). Therefore, a juror is presumed and permitted to attach a reasonable, common meaning or understanding to the phrase. *Id.* Thus, the trial court acts within its discretion by denying a challenge for cause to a juror who attaches such a meaning. *See id.* There is no "bright line rule" stating that certain types of offenses or bad acts are not criminal acts of violence. *See id.* at 788-79 (declining to categorically exclude threats of violence and property crimes from the scope of the phrase "criminal acts of violence"); *see also Burks v. State,* 876 S.W.2d 877, 894 (Tex. Crim. App. 1994) (explaining that crimes against property can be crimes of violence, depending upon the facts and circumstances of each case).

In this case, the prosecutor asked Hicks an open-ended question, "What do you think criminal acts of violence are?" Hicks responded, "Anything that wouldn't fall into the normal structure of wherever you are -- I don't know how to explain it." The prosecutor suggested that the phrase could encompass "anything from another murder all the way down to a threat," but added that the phrase was not defined and that each juror could decide what he thought was a criminal act of violence. Later, defense counsel asked Hicks, "[W]hat is your view of what criminal acts of violence are?" Hicks expressed his understanding that

the phrase included any violation of a law or rule. Defense counsel did not inquire further into Hicks's understanding of this phrase but instead asked Hicks about his understanding of another phrase, "continuing threat," which Hicks described as something that "would happen over and over again."

The fact that the phrase, "criminal acts of violence," is not legally defined did not prevent defense counsel from exploring Hicks's ability to attach a common meaning to it. Assuming *arguendo* that Hicks's responses concerning the phrase "criminal acts of violence" indicated that Hicks did not attach to it a reasonable, commonly accepted meaning, defense counsel was nevertheless required to question Hicks further to establish that he was biased against a phase of the law upon which Appellant was entitled to rely. *See Feldman,* 71 S.W.3d at 744. "A potential juror's initial disagreement with any phase of the law relevant to a case does not merit a per se excusal for cause." *Cockrum v. State,* 758 S.W.2d 577, 586 (Tex. Crim. App. 1988). "Instead, further examination may reveal misapprehension of relevant substantive law, trial procedure, or even the meaning of counsel['s] questions." *Id.*

In this case, defense counsel could have asked Hicks if he perceived any difference between the phrases "criminal acts" and "criminal acts of violence." Similarly, counsel could have inquired into Hicks's understanding of the word "violence" and the phrase "acts of violence." Instead, defense counsel accepted Hicks's initial answer to his open-ended question and pivoted to another subject. Having made no effort during voir dire to clarify Hicks's understanding or establish that Hicks was biased against a phase of the law upon

which Appellant was entitled to rely, Appellant has not shown that the trial court abused its discretion by denying Appellant's challenge for cause to Hicks.

*West*

Appellant challenged West on the grounds that he: improperly shifted the burden of proof to the defendant; had an erroneous understanding of the term "probability" as used in the future dangerousness special issue; and favored the credibility of police officers as witnesses.

When the prosecutor explained the State's burden of proof, West agreed that the State had to prove its case beyond a reasonable doubt. He expressed his understanding that a defendant was presumed innocent until the State proved otherwise, and he stated that he would find the defendant innocent if the State did not prove its case. Similarly, West stated that he would hold the State to its burden of proof on the future dangerousness special issue. West also stated that he would not require the defendant to present evidence.

Defense counsel asked West whether, if the State had not proved its case beyond a reasonable doubt, he would consider the defendant's failure to present evidence as a reason to find him guilty. West responded that he would not. Counsel then asked West whether he thought it was "fair" that the defense attorneys did not have to present any evidence for the defense during the trial. West replied that it did not "seem fair." He explained that he thought defense counsel "would want to produce evidence for your client, or the person, individual, in their favor." He responded affirmatively when counsel asked West if he would

expect a defendant to bring forth evidence that the defendant did not commit a crime. Defense counsel asked West whether he would "take that into consideration" when making a decision "beyond a reasonable doubt," and West responded affirmatively.

Defense counsel asked West if he thought that defense counsel "need[ed] to prove the State's theory is not true," and West responded, "Yes, I think it would be in your favor to prove that the State's not right." Counsel then asked, "If I fail to do that and bring you any evidence, are you going to calculate that into your decision making?" West responded affirmatively.

Defense counsel then reminded West that "the law says" that the defendant does not have to bring forth any evidence of any kind or show that the State is wrong. West again indicated that he understood the law. Counsel continued, "What I heard you say is that [in] your heart of hearts, is you really expect the Defendant to say something and for him to prove he's innocent, and he's to prove the State's wrong." West responded, "Yes. Or -- and it might help him get a lesser sentence." Counsel again asked, "[I]in your heart of hearts that's what you expect us to do?" West again answered affirmatively.

The prosecutor then asked West whether he could promise to follow the law, hold the State to its burden of proof, and not hold it against the defendant if the defense did not present evidence. West affirmed that he could do that.

This record reflects that West understood that the State had the burden to prove the defendant's guilt and future dangerousness beyond a reasonable doubt. Notwithstanding his

personal views, West stated that he would not consider the defendant's failure to present evidence as a reason to find the defendant guilty. Defense counsel did not inquire into West's ability to set aside his personal views and follow the law, and West never expressed an inability to do so. *Cf. Ladd,* 3 S.W.3d at 561. We defer to the decision of the trial judge, who was in the best position to ascertain whether West's opinions would interfere with his ability to serve as a juror. *See Davis,* 329 S.W.3d at 807.

When the prosecutor initially asked West for his understanding of the term "probability," West stated that the term meant "might" and "there's a chance of doing it again." The prosecutor then indicated that "probability" meant something more than a possibility, illustrating the point with an example: "[I]t's possible that it could snow in April in Lubbock, but is it probable? Something more than a possibility. Something more than just a mere chance." West expressed his agreement with that definition.

Defense counsel also asked West about the term, "probability." West recalled that he had told the prosecutor that "probability" meant "[t]hey might do something again, or there's a chance it could happen again," but he stated that the prosecutor had provided a better definition than he could. On further questioning, West responded that "probability" meant more than a bare chance; it meant "more than likely."

Although West initially may not have understood that the term "probability" meant "more than a 'mere possibility' or 'bare chance'," West understood and accepted this

distinction once it had been explained to him. *See Murphy,* 112 S.W.3d at 600. Therefore, he was not challengeable for cause on this basis.

The prosecutor asked West whether he thought that all police officers told the truth all the time. West responded negatively, adding, "there's bad eggs in everything." West affirmed that he could start every witness "on a level playing field" and assess witnesses' credibility based on their testimony.

When defense counsel questioned West about this subject, West reiterated that he did not believe that a police officer would be a more credible witness than another person. Defense counsel then asked West whether an eyewitness would be a "better witness than anybody else." West stated that he did not believe so, but added that he would find an eyewitness to be "very credible." West explained that he would give more credit to the testimony of someone who "was there, they saw it first hand." West then acknowledged that he would credit an eyewitness more than a testifying defendant. He also stated that he would probably "start" a testifying police officer "higher on the scale" than a testifying defendant. West stated that he would probably give eyewitnesses "a leg up on police officers," and he would give police officers "a leg up on" the defendant.

The prosecutor then pointed out that West, as a juror, would not know whether a witness was an eyewitness until that witness started testifying. West confirmed that he would not judge the credibility of a person who took the witness stand until that person started

talking. He stated that he would evaluate the witness's credibility based on that witness's testimony and how it compared to the other evidence and testimony presented.

This record reflects that West's responses indicated that he was open-minded and persuadable, with no extreme or absolute positions regarding the credibility of any witness. *Jones,* 982 S.W.2d at 389-90. To the extent that West's answers were vacillating, unclear, or contradictory, we accord particular deference to the trial court's decision. *See Hernandez,* 390 S.W.3d at 317. The trial court did not abuse its discretion by denying Appellant's challenge for cause to West.

*Hampton*

Appellant challenged Hampton on the grounds that she would require the defendant to testify and produce evidence to disprove his guilt and future dangerousness.

When the prosecutor asked Hampton if she had any thoughts about why a defendant would not want to testify, Hampton responded, "There could be a lot of reasons why they wouldn't want to testify." The prosecutor then suggested that a person might be so afraid of testifying that he could not communicate, or he might not speak English very well. Hampton did not disagree with the prosecutor's statement that a juror could not hold a defendant's decision not to testify against him.

When defense counsel questioned Hampton concerning her "feelings" about a defendant's right to remain silent and right not to testify, Hampton replied that the law gave the defendant "a choice." Counsel asked Hampton if it would "seem frustrating" to her if the

defendant did not testify. She answered, "I mean, if he feels that's in his best interest then it wouldn't frustrate me if that's the choice he made." Counsel asked her whether she could set the defendant's failure to testify aside and not hold it against the defendant. Hampton stated, "I mean, part of me would wonder what he thinks through all this, if he's being accused -- yeah, definitely. But I think I could look past that for sure." Defense counsel continued, asking Hampton whether she would feel that the defendant was guilty if he did not testify, and she stated that she disagreed with that.

This record does not support Appellant's allegation that Hampton would consider a defendant's failure to testify as evidence against him. The trial court did not abuse its discretion by denying Appellant's challenge on this basis.

Hampton also indicated that she understood that the State had the burden to prove a defendant's guilt beyond a reasonable doubt by presenting evidence to the jury. She stated that it made sense that the accuser had to prove the accusations. When defense counsel asked Hampton what she felt about "[t]he idea that the Defendant has no burden" and "doesn't have to do anything," Hampton responded, "I think that that's in wording, but it's not realistic." She explained that although the law placed the burden on the prosecution, the "Defense also has a burden to counteract, I guess. I mean, you have a burden as well even if it's not in writing that way." Defense counsel then asked Hampton, "What kinds of things do you expect the Defendant to do with their burden?" Hampton stated that she would expect the defendant "to confirm or deny" the prosecutor's allegations. Defense counsel asked

Hampton whether in her "belief system" the defendant would also have to "prove some things" to her, and she responded affirmatively. She indicated that it was "part of human nature" to expect the defense to present something.

The prosecutor then told Hampton that defense counsel would "zealously advocate for their client," but asked her to assume that the defense did not do anything:

Q. And you can't require them to do anything in order to either find him not guilty or answer those questions in such a way that a life sentence was given.

A. Right.

Q. What you have to be able to commit to, if you can, is, "I'll listen to whatever evidence is presented and that's what I'll make my decision on. I'm not going to speculate and guess what additional things should be out there."

A. Right.

Q. You see why this is a silly question. Everybody knows that they're not going to do that. But can you promise the Court that you will, again, base your decision on what you have and won't care what you don't have necessarily?

A. Absolutely, yes.

In this exchange, Hampton confirmed that she would listen to the evidence presented and make a decision without speculating about evidence she had not heard.

This record supports the trial court's determination that Hampton could set aside her personal views and follow the law. *See Saldano,* 232 S.W.3d at 94-96. To the extent that her answers were unclear or vacillating, we defer to the trial court's decision. *See Hernandez,* 390 S.W.3d at 317. The trial court did not abuse its discretion by denying Appellant's challenge for cause to Hampton.

*Timmons*

Appellant challenged Timmons on the ground that his opinion of the case was influenced by his exposure to media coverage, such that he was biased against the law upon which Appellant was entitled to rely. Specifically, defense counsel asserted that Timmons had been affected by the media coverage because when he completed the juror questionnaire in March 2014, he could still recall details of the December 2011 news stories concerning the offense, including information that the defendant was a gang member and a drug trafficker.

For an accused to receive a fair trial consistent with due process of law, the jury must determine his guilt or innocence solely on the basis of the evidence admitted at trial and not on the basis of facts or allegations appearing in the media. *Narvaiz v. State,* 840 S.W.2d 415, 428 (Tex. Crim. App. 1992). Article 35.16(a)(10) provides that a prospective juror must be discharged if, from exposure to pre-trial publicity such as newspaper articles or other media, he forms a conclusion as to the guilt or innocence of the defendant that would influence his verdict. *Cooks v. State,* 844 S.W.2d 697, 710 (Tex. Crim. App. 1992); *see also Devoe v. State,* 354 S.W.3d 457, 474 (Tex. Crim. App. 2011). However, if a prospective juror testifies that he can set aside any outside influences and render a fair and impartial verdict based upon the evidence presented, the trial court acts within its discretion by denying a challenge for cause. *Cooks,* 844 S.W.2d at 710.

Timmons indicated on his juror questionnaire that he was aware of this case from publicity at the time of the offense and at the time the suspects were arrested. He recalled that there was more than one suspect in the case. He also recalled that one of the suspects told the victim, "That's what you get," and then the suspects "ran out." Further, he recalled hearing that the suspects had fled to Abilene. He had seen photographs of the suspects and heard reports of their gang affiliation. When the prosecutor asked Timmons during voir dire about these questionnaire responses, Timmons stated that he had eaten at the pizza restaurant less than a month before the robbery, and so the news coverage "kind of got my attention."

In response to a written question asking whether he had seen or learned about any other case with facts similar to this one, Timmons had written, "Texas Gang Drug Trafficking and more." During voir dire, he explained that, when he answered that question, he was recalling that he had first heard news of this case around the same time that he heard some news stories about gang members, and those stories were associated with this case and the defendant.

Timmons also acknowledged that the week before his individual jury voir dire, he had seen a story on the KCBD six o'clock news in which this case was mentioned. He recalled that the news story had been about gangs in Texas. When the story mentioned the facts of this case, he had changed the channel. Timmons stated that that news story was the only coverage about this case that he had seen since completing the juror questionnaire. Timmons repeatedly stated that, based on the coverage he had seen, he had not formed any conclusions

or opinions as to the guilt or innocence of Appellant. He added that he did not believe everything he heard in the news. He promised that, if he were selected as a juror, he would base his decisions in the case on the witnesses and evidence presented in the courtroom, and not on what he had seen or heard elsewhere.

In this case, Timmons frankly described the extent of his exposure to pre-trial publicity. He repeatedly stated that, based on the media coverage he had seen, he had not formed any conclusions or opinions about Appellant's guilt or innocence. We defer to the trial judge, who was in the best position to evaluate Timmons's demeanor and responses. *See Davis,* 329 S.W.3d at 807. The trial court did not err in denying Appellant's challenge for cause.

### *Hanfeld*

Appellant challenged Hanfeld on grounds that he was mitigation-impaired and, therefore, he was biased against a law upon which Appellant was entitled to rely.[35] Specifically, defense counsel asserted that Hanfeld defined mitigation as "something that actually justifies why the murder itself took place," and that Hanfeld's "idea of protecting society pervades his opinions about punishment," with the result that he had a "bias against life without parole" as a punishment.

---

[35] At trial, Appellant also challenged Hanfeld on the ground that he was unable to consider the full punishment range, but he has not renewed this ground on appeal. Therefore, we will not consider it.

The record reflects that Hanfeld expressed no confusion or discomfort with the prosecutor's explanation of the special issues. However, when the prosecutor asked him for an example of mitigating evidence, Hanfeld gave the example of a mercy killing in which a husband ended the suffering of his terminally ill wife. The prosecutor pointed out that in such a situation, the trial would not be for capital murder. The prosecutor then provided other examples of potentially mitigating evidence, noting that each juror would determine the mitigating value of any particular evidence. Hanfeld stated that he could consider all of the evidence and decide whether it provided sufficient mitigation. When the prosecutor asked Hanfeld to review a list of society's reasons for punishing people in the justice system and choose the reason that was most important to him, Hanfeld stated, "I would say punish to protect society."

Defense counsel then asked Hanfeld whether he would always assess the death penalty or a life sentence after convicting a defendant of capital murder. Hanfeld stated that he would not always assess either sentence but instead would "take a look at the evidence that's presented and arrive at a logical conclusion based on the evidence." Hanfeld affirmed that he understood there would be no justification or excuse in the context of a capital murder. Defense counsel then asked Hanfeld, "What are your feelings about the death penalty as the only appropriate punishment for a guilty murderer?" Hanfeld responded, "That takes away any options of mitigating. That's it. I mean, that's the definitive answer to the question. And I -- that would bother me a little bit." He stated that he disagreed that the death penalty

should be the only punishment because there could be different circumstances and variables in each situation.

Defense counsel also asked Hanfeld for his understanding of the future dangerousness special issue. Initially, Hanfeld stated that the question asked whether a defendant would probably commit a similar crime if "released back into a community, be it a prison community or Lubbock, whatever." Counsel then reminded Hanfeld that once a defendant had been found guilty of capital murder, he would be in the penitentiary whether he received a sentence of life or death. Hanfeld indicated that he understood.

When questioned further, Hanfeld stated that someone convicted of a crime would be placed in the penitentiary "for the benefit of the society in general to keep them separate," but as a human being, that person deserved whatever limited rights he would have within the penitentiary. Hanfeld indicated that he believed that death sentences and life without parole sentences protected society. He opined that a defendant's background was an important part of determining the defendant's character and ability to make decisions.

When defense counsel asked Hanfeld how he felt about the fact that some of the terms in the special issues, such as "sufficient" and "mitigating," were not legally defined, Hanfeld described himself as a concrete thinker and acknowledged that he would prefer more concrete definitions of those terms. However, he also stated that even without more concrete definitions for those terms, he could still participate in the process of answering the special issues. Defense counsel stated that mitigating evidence would be any evidence that

suggested that a sentence of life rather than death was the appropriate punishment. Hanfeld affirmed that this definition made sense.

Defense counsel then explained that, unlike the mercy killing scenario in which the husband's motivation for committing the offense was mitigating, mitigating evidence did not have to have "that kind of connection to the crime" or "explain the why of the crime." When defense counsel asked Hanfeld how he felt about that, he stated that he understood the difference and would be able to accept mitigating evidence that did not have a connection to the offense.

Hanfeld was not required to consider any particular type of evidence as mitigating. *See Hernandez,* 390 S.W.3d at 315; *see also Maldonado v. State,* 998 S.W.2d 239, 249 (Tex. Crim. App. 1999). Further, this record does not support Appellant's assertion that Hanfeld's concept of mitigating evidence was limited to evidence that justified the offense. Additionally, the record does not support Appellant's assertion that Hanfeld's concern with protecting society constituted an improper bias in favor of the death penalty. The trial court acted within its discretion to deny Appellant's challenge for cause to Hanfeld.

Because Appellant received two extra peremptory strikes and has failed to show that the trial court erred when it denied his challenges for cause to at least three prospective jurors, he has not shown that he is entitled to relief. *See Buntion,* 482 S.W.3d at 83, 104. Therefore, we need not address whether the trial court erred in denying Appellant's challenges to venire members Castillo and Lamar. Point of error nine is overruled.

ARTICLE 37.071

In points of error ten through sixteen, Appellant challenges the trial court's rulings concerning the constitutionality of Article 37.071. Specifically, in point of error ten, Appellant asserts that the trial court erroneously denied his motion to declare Article 37.071, section 2(f)(4)[36] unconstitutional for limiting the definition of mitigating evidence to that which reduces the defendant's blameworthiness and for overruling his objections that the jury charge unconstitutionally restricted the jury's understanding of mitigating evidence. In point of error eleven, Appellant asserts that the trial court erred in denying his motion to hold that the statutory definition of mitigating evidence is unconstitutional as applied because it imposes a "nexus" limitation. Appellant acknowledges that we have rejected similar arguments. *See Coble,* 330 S.W.3d at 296. We are not persuaded to revisit these issues.

In point of error twelve, Appellant asserts that the trial court erroneously overruled his objections to Texas's "10-12 Rule" and its failure to instruct the jury on the potential impact of a single holdout juror, because Article 37.071, sections 2(d)(2) and 2(f)(2)[37]

---

[36] Article 37.071, section 2(f)(4) provides that the court shall charge the jury that in answering the mitigation special issue, the jury "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."

[37] Article 37.071, section 2(d)(2) provides, in relevant part, that the court shall charge the jury that it may not answer the future dangerousness issue special issue "'yes' unless it agrees unanimously and it may not answer any issue 'no' unless 10 or more jurors agree."

Article 37.071, section 2(f)(2) provides that the court shall charge the jury that in answering the mitigation special issue, the jury "may not answer the special issue 'no' unless it agrees unanimously and may not answer it 'yes' unless 10 or more jurors agree."

unconstitutionally mislead jurors concerning the true effect of their failure to agree on a sentence. He argues that these provisions introduce an intolerable level of uncertainty and unreliability into the fact finding process. Appellant acknowledges that we have rejected similar arguments. *See Prystash,* 3 S.W.3d at 536. We are not persuaded to revisit the issue.

In point of error thirteen, Appellant asserts that the trial court erred in denying his motion to hold that Article 37.071 is unconstitutional "because it provides no definition of critical terms," specifically the terms, "personal moral culpability of the defendant," "probability," "criminal acts of violence," "continuing threat," and "society." We have rejected similar claims. *See Luna v. State,* 268 S.W.3d 594, 609 (Tex. Crim. App. 2008) (rejecting claim that Article 37.071 is unconstitutional for failing to define "personal moral culpability"); *Murphy,* 112 S.W.3d at 606 (concluding that the jury is presumed to understand the terms, "probability," "criminal acts of violence," and "continuing threat to society" without an instruction). We are not persuaded to revisit the issue.

In point of error fourteen, Appellant asserts that the trial court erred in denying his motion to preclude the death penalty as a sentencing option, to declare Article 37.071 unconstitutional, and to place upon the State the burden of proving beyond a reasonable doubt a negative answer to the mitigation special issue. He reasons that the State was required to include the special issues in the indictment and that the "maximum penalty" in the Texas capital sentencing scheme is life, such that the State had the burden to disprove the mitigation special issue beyond a reasonable doubt before a death sentence could be imposed.

We have rejected similar arguments, explaining that, because the "prescribed statutory maximum" under Article 37.071 is death, the special issues need not be alleged in the indictment and the State need not prove beyond a reasonable doubt that there are no mitigating circumstances that would warrant a life sentence. *See Roberts,* 220 S.W.3d at 535; *Rayford v. State,* 125 S.W.3d 521, 533 (Tex. Crim. App. 2003); *Jones,* 119 S.W.3d at 791. We decline to revisit the issue.

In point of error fifteen, Appellant asserts that the trial court erred in denying his motions to declare Article 37.071, section 2(a) unconstitutional because this provision permits the trial court to admit, in an arbitrary fashion, any evidence it deems relevant to sentencing. Specifically, he asserts that this provision introduces arbitrariness, prevents effective appellate review, undermines the adversarial system, and is void for vagueness. He also argues that this provision violates the Texas Constitution's separation of powers clause because the Legislature, by failing to provide trial courts with guidelines for determining what evidence is admissible at the punishment phase of a capital trial, "essentially delegat[ed] to the trial courts the function of declaring punishment policy case-by-case."

The special issues provide a framework as to exactly what evidence is "relevant" under the capital sentencing scheme. *See Smith v. State,* 919 S.W.2d 96, 100 (Tex. Crim. App. 1996). Additional guidance "has come from the United States Supreme Court in the development of Eighth Amendment jurisprudence." *Id.* The meaning of relevance is no different in the context of mitigating evidence in a capital sentencing proceeding than in any

other context. *Tennard,* 542 U.S. at 284. Punishment-phase evidence, like guilt-phase evidence, is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See, e.g., id*. Trial courts routinely determine whether evidence is relevant (and therefore admissible, unless otherwise provided) or irrelevant (and therefore inadmissible). *See* TEX. R. EVID. 401, 402; *Ford v. State,* 919 S.W.2d 107, 114-15 (Tex. Crim. App. 1996) (applying Rule of Evidence 401 in considering whether evidence was "relevant to sentence" under Article 37.071, section 2(a)); *see also Coble,* 330 S.W.3d at 269 n.19 (quoting *Jurek v. Texas,* 428 U.S. 262, 274-76 (1976)) ("[P]rediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system."). Article 37.071's provision that a trial court may admit any evidence it deems relevant to sentencing does not introduce a new element of arbitrariness to such determinations. Similarly, we are not persuaded that the special issues framework provided by the Legislature impermissibly delegates "policy" decisions to the trial courts.

In point of error sixteen, Appellant asserts that the trial court erred in denying his motion to declare Article 37.071 unconstitutional because it allows juries to decide future dangerousness based solely on the facts of the offense. Appellant focuses on the lack of guidance in the jury instructions regarding factors concerning the crime and the defendant that this Court has identified as relevant to assessing the sufficiency of future dangerousness evidence on appeal. He refers specifically to the non-exclusive list of factors enumerated in

*Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). Appellant also points to a lack of empirical data establishing any link between the facts of an offense and the likelihood that an offender will be a future danger.

We concluded that, contrary to Appellant's argument, the submission of the future dangerousness special issue is sufficient to constitutionally guide the jury's determination. *Druery v. State,* 225 S.W.3d 491, 509 (Tex. Crim. App. 2007) (citing *Jurek,* 428 U.S. at 275) (noting that the United States Supreme Court has concluded that the submission of the future dangerousness special issue constitutionally guides the jury's determination); *see also Gardner,* 306 S.W.3d at 303 (citing *Jurek,* 428 U.S. at 276) (concluding that the special issues and mandatory jury instructions of Texas's statutory scheme achieve the heightened reliability required by the Eighth Amendment). "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Coble,* 330 S.W.3d 253 at n.19 (citing *Jurek,* 428 U.S. at 274-76). "Texas law clearly assures that all such evidence will be adduced." *Id.* Thus, the trial court did not err in denying Appellant's motion.

Points of error ten through sixteen are overruled.

## CUMULATIVE IMPACT

In point of error seventeen, Appellant asserts that the cumulative impact of the trial court's errors was so great that reversal is required. Having found little or no error, and no harm, with respect to each point of error separately, we decline to find cumulative harm "so

great that reversal is required." *See Murphy,* 112 S.W.3d at 607 ("Because we have found little or no error in the above-alleged points, there is no harm or not enough harm to accumulate."). Point of error seventeen is overruled.

We affirm the judgment of the trial court.


DELIVERED:      March 6, 2019
DO NOT PUBLISH